**J.S. and A.G., individually and on behalf of J.G., a child with a disability, Plaintiffs,**

v.

**SCARSDALE UNION FREE SCHOOL DISTRICT, Defendant.**

Case No. 09–CV–9571 (KMK).

United States District Court, S.D. New York.

Nov. 18, 2011.

Jesse C. Cutler, Esq., Skyer, Castro, Foley & Gersten, New York, NY, for Plaintiff.

Stephanie L. Burns, Esq., Keane & Beane, P.C., White Plains, NY, for Defendant.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiffs, J.S. and A.G. ("Parents" or "Plaintiffs"), are the parents of J.G., a student who, through January 2008, attended the public schools run by Defendant, the Scarsdale Union Free School District ("Defendant" or the "District"). This case is an appeal and cross-appeal, brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, of an August 19, 2009 decision of a State Review Officer ("SRO") denying Plaintiffs' petition for tuition reimbursement for the period of April 4, 2008 through June 30, 2009. The Parents' claim was heard by an Impartial Hearing Officer ("IHO") who conducted a four-day due process hearing ("the hearing"). Both the IHO and SRO concluded, based on the record developed before the IHO, that while the District failed to provide J.G. with a free appropriate public education ("FAPE") and the Parents' unilaterally chosen private placement was appropriate, equitable factors barred an award of tuition reimbursement to the Parents. The Parents challenge this determination, while the District's cross-appeal seeks reversal of the findings that it denied J.G. a FAPE and that the Parents' private placement was appropriate. Both Parties have moved for summary judgment. For the reasons stated herein, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendant's motion for summary judgment is denied.

### I. Background

The Court has reviewed the full contents of the Administrative Record provided by the Parties. The following facts are drawn from the Parties' Local Rule 56.1 statements, transcripts of the testimony heard by the IHO, and exhibits introduced at the hearing. Although the Parents' claim for tuition reimbursement covers only the costs of J.G.'s private placement from April 4, 2008 through June 30, 2009 (Compl. ¶ 53(e)), a full discussion of J.G.'s educational history prior to the 2007–2008 school year is necessary.

### A. The 2005–2006 School Year: J.G.'s Freshman Year at Scarsdale High School

J.G., now twenty years old, attended the Scarsdale public schools from kindergarten through January of her eleventh grade

year, in the 2007–2008 school year. (Transcript of Due Process Hearing ("Tr.") 697 (testimony of A.G., J.G.'s father).) In 2005, J.G. entered Scarsdale High School. (Def.'s Statement of Undisputed Facts Pursuant to L.R. 56.1 ("Def.'s 56.1") ¶ 14; District Exhibit ("DX") 32.)[1] Up until high school, J.G. had generally excelled academically (and indeed appeared somewhat more advanced than some of her peers), and, according to information provided by the Parents, J.G. had presented no major problems in her educational or social development. (DX 8, at 1 (Educational History of J.G. dated Apr. 13, 2008); DX 11, at 2 (Neuropsychological Evaluation of J.G. by Fern Leventhal, Ph. D.); Parents' Exhibit ("PX") C, at 9 (Application for Admission to Montana Academy dated Feb. 16, 2008).) On paper, J.G. did fairly well academically during her freshman year at Scarsdale, earning an A-grade in Art, B+ grades in English, World History, and Biology, a B in Physical Education, and B-grades in Honors Math and Latin. (DX 16 (Scarsdale Senior High School Transcript generated Mar. 11, 2008).)[2] At the end of the year, J.G. earned a 93 on the Living Environment Regents Exam. (*Id.*) Below the surface, however, J.G. began to have difficulties in school in her freshman year. J.G. began Scarsdale High School with an ambitious schedule, having "insisted," against her Parents' wishes, on taking Latin as well as Honors Spanish, and having switched from "Advanced" to Honors Math approximately one month into the school year. (Tr. 702–03 (testimony of A.G.).)[3] According to A.G., J.G. quickly became overwhelmed by the work and "struggled" through the year, but she did "hold[ ] her own." (*Id.* at 704–05.) J.G. had no trouble getting to school on time that year. (*Id.* at 709.)

J.G. also displayed some signs of emotional difficulties during her freshman year. In the spring of that year, J.G., who had played softball through the eighth grade, tried out for the junior varsity softball team, but was rejected. (*Id.* at 705.) J.G. was "devastated" and told her Parents that she "wanted to kill herself." (*Id.*) The next day, J.G. said that her comment was an overreaction. (*Id.*) Nonetheless, A.G. called the head of the athletic department and informed him of J.G.'s comments, and J.G. was subsequently let on the team, along with all the other students who had tried out but not made the team. (*Id.* at 707.) A.G. also referred at the hearing to J.G. seeing "someone at the school" following this episode, but the hearing record is unclear on this point. (*Id.* at 705–07.)

### B. The 2006–2007 School Year: J.G.'s Sophomore Year at Scarsdale Alternative School

At the encouragement of her parents, J.G. applied to the Scarsdale Alternative School (referred to by all participants at the hearing as the "A School") towards the end of her freshman year. (Tr. 707–09.) Howard Rodstein, the Director of the A School at the relevant time, testified for the District at the hearing. (*Id.* at 266–67 (testimony of Howard Rodstein).) As he explained, the A School is essentially a school within a school—an 85–student "community school[ ]" focused on leadership and character development. (*Id.* at

---

**1.** All citations to the Parties' Local Rule 56.1 statements are to facts that are undisputed, except where noted.

**2.** J.G. also received As in two classes listed as Gr8 Math and Gr8 Spanish on her transcript. (DX 16.)

**3.** J.G.'s older sister had taken honors math all four years of her tenure at Scarsdale High School. (Tr. 702.)

272–73; DX 31, at 1–2 (J.G.'s Sophomore Transcript, including two-page "Profile" of the A School).) Classes are generally smaller at the A School and the relationship between students and teachers is less formal than at the main Scarsdale High School, from which the students at the A School are drawn. The A School offers separate courses from the main high school in several academic subjects, with students taking the remainder of their academic program at the main high school and participating in extracurricular activities there. (Tr. 273; DX 31, at 1.) According to Rodstein, academics at the A School involve more "independent work" than is required at the main high school. (Tr. 275.) Students are assessed by written evaluations rather than letter grades. (Tr. 24 (testimony of Michael Mendelson, Dir. of Spec. Educ., Scarsdale Union Free Sch. Dist.); 276–77 (Rodstein).) Each A School student has an advisor (a member of the staff) and meets individually with that advisor every few weeks. (Id. at 277–78 (Rodstein).) Each A School student also completes an internship in January of each year. (Id. at 273; DX 31, at 2.) The A School holds weekly "community meetings," at which all members of the School (students and staff) discuss "issues of concern to the community" led by teams of students. (Tr. 274–75.)

Admission to the A School is by lottery, but because the school and mandatory internship require a certain level of maturity, applicants who "don't have a sufficient history of responsibility" or "a certain level of maturity and autonomy" are screened out. (Tr. 273–74.) Apart from that, however, students at the A School are self-selected from the larger Scarsdale High School population. (DX 31, at 1.) The A School is not, and is not designed to be, a special education program. (Id.; Tr. 25 (Mendelson); 272 (Rodstein).)

J.G. began her sophomore year as "one of [the A School's] strongest academic students in terms of her performance ...." (Tr. 279 (Rodstein).) Both Rodstein, who was J.G.'s advisor during her sophomore year and her English teacher, and Jennifer Maxwell, the A School History teacher, testified before the IHO that J.G.'s participation, reading, and writing skills were consistently high. (Tr. 279–80 (Rodstein); 431–32 (Maxwell).) Rodstein testified that J.G.'s work became more "sporadic" during the second quarter of the year in that J.G. turned in assignments less consistently and some of her work was "less focused." (Id. at 280.) Similarly, Maxwell testified that J.G. "went through a period when she was having trouble completing assignments and got off track for awhile." (Id. at 428.) A.G. confirmed that J.G.'s performance was "like a sine curve," going "up and down," and that J.G. had a harder time keeping up as the work got more difficult. (Id. at 725–26.) Both Rodstein and Maxwell agreed, however, that J.G. bounced back academically by spring. (Id. at 280, 284 (Rodstein); 428 (Maxwell).) Indeed, Maxwell recommended J.G. for the "Advanced Topics" course in history at the end of the year. (Id. at 432.) Getting into that course required J.G. to take a qualifying exam in January of her sophomore year and collect recommendations from previous teachers. (Id. at 335 (Rodstein); 433 (Maxwell).)

This variable performance is generally not reflected in J.G.'s year-end grades and evaluations, as the narrative comments of J.G.'s teachers are by-and-large positive and do not mention periods of late or missed work. (DX 31, at 5–7 (teacher evaluations in Chemistry, History, and English).)[4] J.G. scored a 97 on the Global

---

4. For instance, J.G.'s Chemistry teacher, who gave J.G. a "Good" for the year (on a scale of

History Regents Exam and earned an "honors designation" in English by reading and writing about two extra novels. (*Id.* at 6–7.) As for the classes J.G. took in the main high school, J.G. received B+'s in "Advanced Mathematics," Physical Education, and Art, and a B in Latin. (DX 31, at TOC; DX 32 (Scarsdale High School sophomore transcript).) Her last two test scores in Math were 94 and 100. (DX 31, at 3.) J.G. interned at a local bakery in January 2007, where she received rave reviews from her supervisor. (*Id.* at 10–13.) J.G. herself wrote in a self-evaluation that the internship raised her "confidence and self-esteem ... tremendously." (*Id.* at 10.)

The one indication on paper, in this generally good set of academic results, that J.G. was experiencing difficulties was J.G.'s Health evaluation,[5] in which J.G.'s teacher wrote that she was "informed" that there were "some personal issues that [J.G.] was working through," and speculated that these "issues" lowered the quality of J.G.'s work. J.G.'s efforts were inconsistent, said the Health teacher, and J.G. sometimes lacked motivation and "left gaps" in assignments. (DX 31, at 8.)

Behind the paper record, J.G.'s sophomore year was when these "personal issues" began to manifest themselves. After the first few weeks of school, during which, according to A.G., J.G. "loved" the A School and appeared to be doing well, J.G. began to get more "irritable" and "sullen" and began having "little temper tantrums." (Tr. 711–12.) Early in the school year, J.G. failed to make the school tennis team, and J.G.'s mother, J.S., was out of town on business for several weeks,

an experience the family had not had before. (*Id.* at 710.) One day in October, when J.S. was not present, A.G. caught J.G. cutting school. (*Id.* at 712–13, 717.) Two days later, A.G. arrived home and J.G. was "groggy." (*Id.* at 714–15.) After sleeping much of the next two days, a weekend, J.G. admitted to A.G. that she had taken a large amount of Tylenol, in her words (as reported by A.G.) "because I wanted to kill myself." (*Id.* at 716.) J.S. had returned home that weekend, and the Parents immediately contacted their pediatrician, who referred them to Dr. Eileen Rabinowitz, a psychiatrist. (*Id.* at 717.) Dr. Rabinowitz recommended that J.G. not be left alone at home, but that she should continue to attend school. (*Id.* at 717.) J.G. began "psychopharmacological treatment" with Dr. Rabinowitz, and the family began participating in "[f]amily [t]herapy." (DX 11, at 3 (Neuropsychological Evaluation by Fern Leventhal, Ph.D).)

After this incident, the Parents informed Rodstein that J.G. had tried to kill herself. (*Id.* at 302 (Rodstein), 718 (A.G.).) A.G. testified that J.S. also informed J.G.'s teachers that J.G. was "fragile." (*Id.* at 719; DX 8, at 2 (Educational History dated Apr. 13, 2008).) Soon after, J.G. began a course of therapy supervised by Dr. Rabinowitz and began taking medications. (Tr. 720–21.) During this time, according to A.G., J.G.'s "ability to function in class ... sort of kind of tumbled," but she was "still doing [her work]" and "still participating." (*Id.* at 721.)

Rodstein, who met periodically with J.G. as her advisor, testified that J.G. became "less sure of herself" as her performance

---

Excellent, Good, Satisfactory, Unsatisfactory, and Fail), said she "finished the year very strongly," having done "excellent work on her exams" and having participated well in

class. (DX 31, at 5 (Chemistry Teacher Evaluation, June 18, 2007).)

**5.** Health Education was a required first semester course. (DX 31, at 8.)

fluctuated. (*Id.* at 285 (Rodstein).) [6] Rodstein had regular phone and e-mail conversations with the Parents, and knew that J.G. had difficulty "getting to school" certain days. (*Id.* at 286.) According to Rodstein, both the Parents and J.G. felt she was not performing to her full potential, (*id.* at 302), and J.G. "vacillated" in advisor meetings between feeling that she faced a "serious problem" in her life and school performance, and feeling that everything was "going to be fine" and that she would work things out on her own, (*id.* at 304). In Rodstein's view, J.G.'s behavior was not an unusual pattern for "kids who go through very difficult times." (*Id.* at 305; *see also id.* at 287 (stating that J.G. was acting "in the way that many teenagers wrestle with issues, difficulties, the expression of those difficulties").) Rodstein confirmed that J.G.'s internship was very successful and that J.G. caught up on work during January 2007. (*Id.* at 306.) By the spring, it appeared to the A School staff that J.G. had "pull[ed] herself out" of her difficulties. (*Id.; see also id.* at 287–88 (stating that Rodstein felt that J.G. was "regaining her position").) According to an evaluation of J.G. completed in late 2007 and early 2008, J.G.'s therapy and medications also produced "[s]ome improvement in mood and weight loss" soon after they began. (DX 11, at 3.)

A.G. also testified that there were a number of days after the Tylenol episode when J.G. "would not get out of bed in the morning." (Tr. 733 (A.G.).) Because neither A.G. nor J.S. could stay at home to force J.G. to leave, A.G. said, there were days on which he called Rodstein and informed him that J.G. would not be coming to school. (*Id.* at 733–34.) There were other days on which J.G. would "get to

school late." (*Id.* at 734.) Rodstein confirmed that J.G. had "issues about getting to school on time." (*Id.* at 302.) The record does not reflect how often these "issues" manifested themselves during the 2006–2007 school year.

On one occasion in the spring of 2007, a conversation took place between one of the Scarsdale District psychologists, Dr. Collabolletta, and one of the Parents. What happened is somewhat unclear: in his testimony, A.G. stated that he talked to Collabolletta. A.G. mentioned that he was concerned about J.G. and was "wondering whether she could be tested and educationally tested." (Tr. 728.) Collabolletta responded a week later, reportedly (according to A.G.) stating that, "because she [J.G.] is averaging about a B minus average and she is going to be a junior next year, [Collabolletta] [did not] see the point in doing testing." (*Id.* at 729.) A.G. testified that he did not know that he could simply have asked to have his daughter tested, and the District would have been required to do it. (*Id.* at 729–30.) However, an "Educational History," dated April 13, 2008, was prepared after J.G. had been referred to the District's Committee on Special Education ("CSE"), based on an interview with J.S. and information given directly by J.S. (*Id.* at 59 (Mendelson).) The Educational History states that "I"— presumably meaning A.G. not J.S.—"had a conversation" with Collabolletta in which "I asked Dr. Collabolletta to have her tested to see if she might benefit from being classified." Dr. Collabolletta's response was that J.G.'s academic average and "the fact that she would be in the 11th grade next year" meant that "the testing was irrelevant and in his opinion unnecessary." (DX 8, at 2.)

---

**6.** This testimony, like much of the testimony at the hearing, is somewhat vague about specific dates. It appears from the transcript that Rodstein was describing events and conversations he had in late fall and early winter of the 2006–2007 school year. (Tr. 302–06.)

In her own self-evaluation of her sophomore year, J.G. wrote that her "personal issues" had "nearly overwhelmed" her, but that she was "proud of how [she] dealt with [her] problems and learned so much both academically and personally." (DX 31, at 3.) She wrote that her therapy had been successful and she was able to improve her grades substantially during her second semester. (*Id.*) J.G.'s confidence also improved, and she participated more at the A School's community meeting. (*Id.* at 4.) Based on the "insight into who [she] [was] as a student" that she had gained her first year at the A School, J.G. "intend[ed] to excel" the following year and become more active in the school community. (*Id.*)

A.G.'s description of how J.G. ended her sophomore year was somewhat less positive. He testified that the family was undergoing "group therapy" by that point. (Tr. 731.) J.G. dropped out of the softball team and, according to A.G., "began binge eating" and "totally cut herself off from her friends." (*Id.*) J.G. ended the year "being more withdrawn and isolated." (*Id.*) Over the summer, J.G. took drawing classes in Manhattan, commuting there with her mother, and stayed, as A.G. described it, in a "sort of a holding pattern." (*Id.* at 731–32) A.G. testified that the Parents remained concerned about J.G. at the beginning of the next school year. (*Id.* at 732.)

### C. The 2007–2008 School Year: J.G.'s Junior Year at Scarsdale Alternative School

J.G. began her junior year in strong fashion academically, and it appeared to the A School staff that J.G. saw herself as "stronger emotionally than she had been"

and "hopeful" at the start of the year. (Tr. 307–08; *see also id.* at 311–12 (Rodstein); DX 37 (American Studies First Semester Cumulative Evaluation) (stating that J.G. "started out the year strong" and had grades "among the best in the class" on certain tests and assignments).) By October, however, J.G. began to struggle. (Tr. 732, 734 (A.G.).) J.S. sent an email to Rodstein on October 14, 2007, indicating that J.G. was "extraordinarily anxious and Latin averse," and notifying him that J.G. was about to drop her Latin class. (DX 34.) By mid-to late-October, J.G.'s American Studies teachers also began to notice that J.G. was "again experiencing some difficulties." (Tr. 314 (Rodstein).) [7] A meeting was held in mid-October with the Parents, J.G., and Rodstein, the result of which was that J.G. dropped Latin. J.G. stated at the meeting that she was concerned about Latin rather than her overall performance, and there had been indications earlier that she had a difficult relationship with the Latin teacher. (Tr. 315–16, 319–20; DX 34, 35 (Email from J.S. to Rodstein (Oct. 23, 2007)).) A week later, J.S. reported to Rodstein that J.G. continued to have difficulties completing (and, it appears, starting) her assignments, and that she had cut her Physics class. (DX 35.)

At the hearing, Rodstein and Maxwell gave slightly different takes on the A School's reaction. Rodstein testified that the A School staff saw J.G. as "more self aware" than she had been the previous year, and he felt that J.G. was "more articulate" and "more engaged." (Tr. 322–23.) But, at the same time, J.G. at times "felt paralyzed . . . about handing in work." (*Id.* at 322.) Rodstein appears to have been concerned, and he asked the A

---

**7.** American Studies is a joint English/Social Studies course taken at the A School that is "team taught." Maxwell taught the Social Studies side of the course. (Tr. 314, 433; DX 37.)

School staff to report any strange behavior on her part. (*Id.* at 438 (Maxwell).) Maxwell noted that the workload gets more difficult for *all* students during their junior year at the A School, and that, while J.G. did fall behind in the second quarter of the semester in American Studies, "she was one of a number of kids who were having that problem, five or six...." (*Id.* at 436.) Maxwell said that the A School staff was split on their assessment of J.G., some feeling "she [was] just fine" and not seeing "any evidence of anything," with others "who were a bit more concerned about her." (*Id.* at 444.) Maxwell, who taught J.G. in two classes, did not report thinking that J.G. displayed any unusual behavior during the semester. (*Id.* at 439, 444 ("I don't remember personally thinking there was any particular worry about [J.G.]"), 445 ("I didn't see anything that I thought was indicative of any serious issues with [J.G.]").) J.G. took a trip to Massachusetts in mid-October with Maxwell and the other students in her Advanced Topics history course, during which J.G. was "friendly with the other kids," "really excited," and "had a great time." (*Id.* at 437.) The only unusual thing Maxwell noticed was that J.G. "slept the whole drive back," but she noted that the "kids were up fairly late." (*Id.*)

In early November 2007, after being selected by the A School staff, J.G. attended a several-day conference for the Coalition for Essential Schools in Denver, Colorado along with five other students. (Def.'s 56.1 ¶¶ 62–63; Tr. 308, 328 (Rodstein); 439 (Maxwell).) The Parents used attending the conference as an incentive for J.G. to get caught up on her work before she left. (DX 36 (email from J.S. to Rodstein (Oct. 28, 2007)).) This apparently worked, as J.G. did catch up on some assignments before traveling. (Tr. 326–27 (Rodstein).) At the conference, J.G. participated articulately in workshops and presentations, in-

cluding one conducted by the A School team, and she was friendly with her peers. (*Id.* at 439 (Maxwell).) J.G. appears to have enjoyed the experience and cogently presented about it at the A School's community meeting. (*Id.* at 328–29 (Rodstein).)

Soon after the conference, however, Rodstein reported that "the pattern" that had been observed the previous year "recurred" (*Id.* at 329); J.G. began falling behind in her assignments again and her performance became weaker in some subjects. (*Id.* at 329–30.) Emotionally, according to Rodstein, she became "more and more negative" and "less talkative" and more "shut down" in their advisor-advisee conversations, and she appeared "sad" and on some occasions became "tearful." (*Id.* at 330.) Crying, Rodstein said, was "not outside the norm" among his female advisees, however, as A School students were, in his experience, "remarkably open about very intense feelings." (*Id.* at 346–47.) A.G. agreed that J.G.'s performance again became "up and down." (*Id.* at 741 (A.G.).) J.G. was able, however, to complete "the most difficult assignment" in the American Studies program, a major research paper. (Tr. 329 (Rodstein); *see also id.* at 436 (Maxwell) (describing the assignment).) Maxwell testified that she began to worry about J.G. academically by mid-November, and stated that J.G. was falling behind in her assignments during this period. (*Id.* at 436; *see also* PX H–J (emails between Maxwell and J.S. about a late paper for American Studies dated Nov. 21, 26, and Dec. 3, 2007).) Again, however, Maxwell noted that this was not unusual for A School students, as the second quarter workload in American Studies, which included the research paper, was "really difficult for many students" and that J.G. was "one of a number of kids who were having ... problem[s]" keeping up

with assignments. (*Id.*) J.G. remained up to date in her Advanced Topics history course, also taught by Maxwell. (PX J.)

As the semester went on, J.G.'s academic performance remained variable and inconsistent. Her cumulative semester evaluation for American Studies indicated that she had kept up with much of her English work, but that some papers were "thinly developed or never came in." (DX 37 (American Studies Cumulative Evaluation, dated Jan. 21, 2008).) J.G. also stopped doing "daily homework" for the Social Studies side of the course. (*Id.*) Rodstein also testified that there was a "distinct disparity" in J.G.'s work effort across subjects as the fall progressed; this was discussed at the A School staff meetings. (Tr. 362.) Still, "a substantial amount of work was coming in." (*Id.* at 360.)

*D. The Winter of 2007–2008: J.G. Withdraws from the District Schools*

By December 2007, according to A.G., J.G. was "not functioning well" and "having a very hard time getting out of bed to go to school. Every day was a battle." (Tr. 750 (A.G.).)[8] Rodstein testified that J.G.'s inability to get out of bed was a "relatively minor occurrence in October" but that it became "more profound in November." (*Id.* at 350 (Rodstein).) J.G.

was again binge eating during this period, and A.G. would discover her "watching TV instead of doing her homework" when he came home. (*Id.* at 752–53 (A.G.).) J.G. was attending therapy, but otherwise was not socializing with other students, and she told the Parents that she wanted to drop out of school. (*Id.* at 750.) After consulting Dr. Rabinowitz in November 2007, the Parents decided to have J.G. "tested" for "some kind of learning disorder," because they felt that J.G.'s therapy was not working. (*Id.* at 751.)

Dr. Rabinowitz recommended Dr. Fern Leventhal, a clinical neuropsychologist with whom A.G. was familiar from his professional life. (*Id.* at 638, 751.) Dr. Leventhal testified at the hearing. (*Id.* at 634–35.) She evaluated J.G. in November and December 2007 and produced a report in early 2008. (*Id.* at 642.) When J.G. first came to Dr. Leventhal, J.G. was having a hard time getting out of bed in the morning, and "complaining about organizational issues[,] about getting her work done, [and] about not being motivated to do it," and she was "concerned about her performance." (*Id.* at 644.) Dr. Leventhal performed various educational tests and reviewed checklists filled out by her teachers. (*Id.* at 645–46; 650–52.)

These checklists, which are also in the record, were filled out by Rodstein and Maxwell in late November 2007. (Tr. 332–

---

**8.** The record is somewhat unclear on the extent to which J.G.'s problems "getting out of bed," which apparently worsened as the school year went on, actually led her to miss school. J.G.'s attendance summary for the first semester shows a significant number of absences in the three classes listed, but does not indicate that J.G.'s missed classes increased as the year went on. J.G. was absent from Physics 12 times in Term 1 and 8 in Term 2, and absent from Precalculus 6 times in Term 1 and 7 times in Term 2. Either way, her absences were significant, but her first term grades in these subjects were not meas-

urably different from her sophomore year grades (she received a B-for the first term in Physics and a B+ for the first term in Precalculus). (DX 15; *see also* DX 16) Also, there does not appear to be anything in the record counting J.G.'s absences from other classes. In her testimony, Maxwell did not mention significant numbers of absences from American Studies or Advanced Topics. But, Dr. Mendelson, the District's Director of Special Education, stated that he had learned "from conversation" that there were "an increased amount of absences in around November [2007]." (Tr. 23 (Mendelson).)

33, 446, 647; DX 30.) Rodstein, whose responses on the checklist were based on his own interactions with J.G. and contacts he had with J.G.'s other teachers (*id.* at 332–34), indicated that J.G. was performing "at" or "somewhat above" grade level in each of her classes, that her behavior was "much more" appropriate than the average student's, and that she was "intellectually curious, creative, sensitive, reflective[,] self-aware [and] funny." (DX 30, at 1–2.) But, he also reported that J.G.'s work effort "varie[d] considerably," that she was "somewhat less" happy than a typical student, and that she "gets stuck [and] then she sometimes becomes immobilized." (*Id.* at 2.) Rodstein also wrote that "[J.G.] is clinically depressed" (*id.*); this information he got from J.G.'s own year-end sophomore year self-evaluation, in which she said that she had been "diagnosed with clinical depression and an anxiety disorder" that year. (Tr. 337; DX 31, at 3.)[9] On her checklist, Maxwell agreed that J.G. was performing at or above grade level in her social studies classes, and noted that J.G. had "lively curiosity . . . high intelligence[,] . . . [and] a good sense of humor." (DX 38, at 1–2.) But, J.G. "sometimes [had] difficulty focusing on and completing assignments," sometimes had "mood swings," and "gets overwhelmed by work." (*Id.* at 2.) Maxwell stated that J.G. was "on medication for depression," something Maxwell testified she had learned either from Rodstein or from J.G. herself. (*Id.*; Tr. 449 (Maxwell).)

The report Dr. Leventhal produced following her analysis of J.G. identified a constellation of emotional difficulties that together were "clearly indicative of a Dysthymic Disorder" (DX 11, at 11)—an "affective or mood disorder which is prolonged, a level of depression that is extended over a year's time in which an individual has feelings of hopelessness" (Tr. 659 (Leventhal).) The continuous nature of J.G.'s symptoms meant that for Dr. Leventhal, even if J.G. had periods of increased "hopeful[ness]," she still had a dysthymic disorder. (*Id.* at 679–80.) In making this diagnosis, Dr. Leventhal was unaware of the school trips J.G. had taken in October 2007, and testified that it would be "a little bit surprising" to her if J.G. had been "totally interactive and going out late with kids and so forth" during those episodes. (*Id.* at 673.) Dr. Leventhal distinguished J.G.'s dysthymic condition from "major depression," which J.G. did not have, in her opinion. (*Id.* at 682; *but see id.* at 649 (agreeing that J.G. "presented with a depressed mood").) The emotional problems Dr. Leventhal identified included extreme perfectionism, high levels of anxiety, "weak coping capacities," very low self-esteem and self-image, body issues, avoidant behavior, and a generally "sad mood." (DX 11, at 3, 8–11.) On cognitive tests, J.G. generally did very well, and Dr. Leventhal testified that J.G. did not have any sort of learning disability or problem. (Tr. 653.) However, J.G.'s emotional problems made it difficult for her to function. (DX 11, at 10.)

The Parents met with Dr. Leventhal on January 1, 2008, a meeting at which Dr. Leventhal, according to A.G., "scared the life out of us [the Parents]." (Tr. 755.) In Dr. Leventhal's view, an immediate intervention was necessary in order to "disrupt [J.G.'s] recent academic and emotional decline." (DX 11, at 14.) As A.G. put it, "[Dr. Leventhal] felt that we had to get

9. J.G.'s precise clinical diagnosis is the subject of conflicting evidence in the record, as will be discussed below.

[J.G.] ... out of Scarsdale, out of high school because of her concern that she was going to kill herself." (Tr. 754.) Otherwise, J.G. would likely drop out of school entirely, or else muddle through the remainder of high school, get to college, and then collapse. (*Id.* at 755.)[10] Dr. Leventhal explained that J.G.'s perfectionism coupled with her anxiety meant that she would be unable to "do the work," and that J.G.'s presence in the family home, where she felt she was "competing with her older sister, who she sees as being absolutely perfect and brilliant, and ... with her mother," "erase[d] the therapy" J.G. had been undergoing. (*Id.* at 755–56.) Dr. Leventhal recommended, among other things, that J.G. engage in a more intensive course of therapy than the "once or twice-a-week process" that she had been doing until that point. (DX 11, at 12.) As for J.G.'s schooling, Dr. Leventhal recommended that the Parents seek "an immediate program change": she suggested considering "a local school program as well as a residential setting," with the "most important factors" affecting the Parents' decision being "intensification of [J.G.'s] exposure to therapeutic intervention, a population of similar adolescents, and selection of a setting where the academic work is both stimulating and challenging." (DX 11, at 13.)

Dr. Rabinowitz referred the Parents to Barbara Posner, an educational consultant, with whom the Parents met in early January 2008. Posner informed the Parents of the option of sending J.G. to a "therapeutic boarding school." (Tr. 757–58 (A.G.).) Before J.G. attended such a school, Posner told the Parents, J.G. would have to attend a "wilderness program." (*Id.* at 759–60.) It appears from A.G.'s testimony that the Parents viewed the wilderness—boarding school combination as the "other alternative" to hospitalization of J.G.—the Parents had considered hospitalization because they "felt [she] was going to kill herself." (*Id.* at 802.) According to A.G., the Parents felt they needed to make a decision fast. (*Id.*) Posner did not recommend speaking to the District before taking J.G. out of the District schools, nor did she discuss the CSE process with the Parents. (*Id.* at 803.)

On January 13, 2008, J.G. enrolled in the True North Wilderness Program in Waitsfield, Vermont ("True North"). (DX 14 (letter from Christine Foley, True North Wilderness Program, to Scarsdale High School (Jan. 11, 2008)).) The District was informed that J.G. would be in the program, and that it would last for six to eight weeks, by a letter from True North dated January 11, 2008. (*Id.*) Dr. Mendelson, the District's Director of Special Education, testified that the District "received notice that [J.G.] was withdrawn" on January 14, 2008. (Tr. 30.) A.G. also referred briefly to sending a letter to the District when J.G. was enrolled in True North, but he did not state when that letter was sent, and no such letter appears in the record. (Tr. 761.) The first communication from the Parents to senior District officials that

---

**10.** Although A.G.'s testimony strongly suggests that Dr. Leventhal thought the risk that J.G. would commit suicide remained quite high (*see* Tr. 754–55), it bears noting that Dr. Leventhal's actual report does not mention any fear that J.G. was suicidal. The report does not describe the Tylenol incident as a suicide attempt, but rather as an "overdose." (DX 11, at 3.) And, in Dr. Leventhal's testimony, she did not indicate that she thought J.G. had suicidal tendencies. Indeed, the tests Dr. Leventhal performed suggested otherwise. (Tr. 682 (stating, in response to why Dr. Leventhal had not recommended hospitalization, that "I did not diagnose [J.G.] with a major depression at the moment.... I felt that she ... was more avoidant and withdrawn, and ... she did not endorse for me active suicidal ideations on the Millon or the Beck [tests].").)

appears in the record is a letter dated January 25, 2008, from J.S. to Susan La-Salle, the Chair of the District's CSE, requesting that J.G. be "evaluated for Special Education by the Scarsdale [CSE]." (DX 1.)

### E. J.G.'s Application and Acceptance to Montana Academy

In February 2008, the Parents completed an Application to Montana Academy ("MA") in Kalispell, Montana, a school recommended by Posner. (Tr. 764, 766; PX C (Application for Admission, Montana Academy (Feb. 16, 2008)).) The application process involved a lengthy paper application and a visit to the school by the Parents (alone, without J.G.). (Tr. 766–67.)[11] In the application, the Parents explained J.G.'s difficulties and stated that J.G. was "doing well" at True North. The Parents were "exploring the next step for her education." (PX C, at 5.) The Parents visited MA in late February 2008 and were impressed with the students and the school. J.G. was accepted after their visit. (Tr. 767–69.) According to John McKinnon, the co-CEO and co-founder of MA, who testified for the Parents at the hearing (id. at 461, 465 (McKinnon)), a student is never accepted at MA without a parental interview, (id. at 483, 518–19). MA accepts "one out of every five or six students that is referred to it," so, according to McKinnon, the school staff is "selective and thoughtful about who [it] accept[s]." (Id. at 482.)

The MA application contains a "Parent Enrollment Agreement," on which the Parents agreed to the following statement:

Parents understand that they are committing to enroll their child for the duration necessary to complete the program that is approximately 16–18 months but may be longer in some cases. Funding for a full 18 months should be secured prior to enrollment.

(PX C, at 30.) Additionally, in a "Financial Agreement," the Parents agreed to pay a $1000 "enrollment fee." (Id. at 31.) They also paid the first and last months' tuition, agreeing that "[i]n the event [they would] choose to withdraw the student without 30 days written notice prior to the completion of the program the last month's tuition will be forfeit[ed]." (Id.) When asked about the Parent Enrollment Agreement at the hearing, and whether he thought it committed the Parents to keep J.G. in MA for the full length of the program, A.G. responded:

We were still operating on a—I mean, we knew that sometimes parents take their kids out sooner and put them into other schools. But if this is what it took to sign to get her into the school, this is what we signed. I don't think we were committed—just like we didn't hand over $180,000 or whatever the amount would be for 18 months, but we signed a lot of forms. We signed one—okay.

(Tr. 797.)

### F. J.G.'s Referral to the CSE and the CSE Process

#### 1. Initial Evaluation

Four days after the date of the Parents' written request that J.G. be evaluated by the District CSE, the District sent the Parents a notice that J.G. would be referred to the CSE, along with a procedural safeguards notice, the District's guide to special education, and, of significance here, a consent form. (DX 2, at 1–2 (Letter

---

**11.** It was later explained at the hearing that MA "usually select[ed] students before [its staff] met them." (Tr. 481 (McKinnon).) The school staff wanted to be assured that the students' parents would be active and supportive in the students' education at the school. (Id. at 481–83, 518–19.)

from Michael D. Mendelson to Parents (Jan. 29, 2008)).) The District's letter explained that the "initial step" in the CSE process was an "individual evaluation" of J.G., which would determine J.G.'s eligibility for special education services and help aid the District in developing an Individualized Education Program ("IEP") if she were found eligible. (*Id.* at 1.) The letter said the evaluation could involve a psychological evaluation "if appropriate." (*Id.*) The consent form was needed, the District told the Parents, in order for the District to conduct the evaluation. (*Id.*) The Parents returned the signed form, thereby "grant[ing] consent for referral and evaluation by the [CSE]," with the District receiving it on February 5, 2008. (DX 3; Tr. 37 (Mendelson).)

Mendelson testified that the types of information that the District would look to for any particular evaluation would vary, but that in J.G.'s case, a "psychological evaluation" and "educational evaluation" would be "standard element[s]." (Tr. 38.) These documents would "help[ ] [the District] determine, at least initially, what other evaluations may be needed." (*Id.* at 39.) The District would also eventually need a "social history" and medical information. (*Id.* at 38.)

On February 25, 2008, J.S. e-mailed a copy of Dr. Leventhal's report to LaSalle. (DX 10 (Letter from J.S. to Susan LaSalle (Feb. 25, 2008)).) The next week, LaSalle contacted the Parents by letter, which stated in relevant part:

> Given the fact that you believe your daughter, [J.G.], may require a residential placement, it is the desire of the district that [J.G.] meet with the district psychiatrist. Please supply us with the

dates and times [J.G.] will be available for the assessment. The CSE will be limited in its ability to understand your child's needs and recommend an appropriate placement without this assessment.

(DX 4 (Letter from Susan LaSalle to Parents (Mar. 4, 2008)).) J.S. responded one week later:

> As I advised you and/or Ernie Collabolletta during conversations had last week and as recently as yesterday, [J.G.] is not likely to be in Scarsdale at any time in the near future; all of the people treating [J.G.] or advising us in any fashion strongly recommend[ed] against bringing her home before any future placement in a residential setting; and the district is fully authorized to conduct its evaluation of [J.G.] in Vermont. Additionally ... if the district would like to confer with [J.G.'s] treating psychiatrist, that can be arranged easily.

(DX 5 (Letter from J.S. to Susan LaSalle (Mar. 11, 2008)).) Attached to J.S.'s response was a letter from Dr. Rabinowitz dated January 16, 2008, stating that J.G.'s functioning had "declined precipitously" in recent weeks, and that the True North program was "a clinically necessary intervention to treat [J.G.'s] impairing psychiatric condition." (*Id.*; DX 13 (Letter from Ilene Rabinowitz, M.D. (Jan. 16, 2008)).) [12] At the hearing, A.G. confirmed that "on the advise [sic] of the treating psychiatrist, as well as the advise [sic] of the program, True North," the Parents believed that "it would not be advisable for [J.G.] to be brought back [to Scarsdale] to be evaluated by a psychiatrist." (Tr. 773.) On March 19, 2008, J.S. e-mailed LaSalle to inform her that J.G. would complete the

---

**12.** Dr. Rabinowitz also stated that J.G. "carrie[d] several different ... psychiatric diagnoses," including "Major Depressive Disorder, Severe, without Psychotic Features";

"Anxiety Disorder"; and "Attention Deficit Disorder, Primarily Inattentive Subtype." (DX 13.)

True North program on April 2, 2008, and would be enrolling at MA on April 4. (PX E (E-mail from J.S. to Susan LaSalle (Mar. 19, 2008)).) J.S. reiterated that J.G. would not be returning to Scarsdale and that "[t]he district remains fully authorized to conduct its evaluation of [J.G.] in Vermont or in Montana." (*Id.*) The record does not reflect whether the District responded to this e-mail specifically.

Ultimately, the District never did conduct its own psychiatric evaluation of J.G. (Tr. 39 (Mendelson).) Dr. Mendelson identified two reasons for this at the hearing. (*Id.*) First, the District had Dr. Leventhal's report, which it appears to have relied upon—for instance, the District based its summary of J.G.'s educational abilities on the cognitive test results detailed in Dr. Leventhal's report. (DX 9, at 1 (Summary of Academic Achievement (Apr. 10, 2008)).) Second, Dr. Mendelson testified that the District "had no access to the child, at least directly" and that he felt it was not the District's responsibility to "go to Vermont to evaluate a child." (Tr. 39, 44.) Dr. Mendelson discussed e-mail communications with J.S. taking place around mid-March in which J.S. apparently "questioned the need" for an evaluation and stated that J.G. was "available" for evaluation in Vermont. (*Id.* at 43–44.) The record also reflects that J.S. had similar exchanges with other members of the District's staff. (DX 6 (E-mail from J.S. to Susan LaSalle (Mar. 13, 2008) ("As I discussed in my conversation this morning [with Dr. Collabolletta], [J.G.] remains available to be examined in Vermont by the District Psychiatrist. I have not received a the [*sic*] District's response on that point.")).) When cross-examined, Dr. Mendelson testified that he had, in the

past, traveled to evaluate a student in an out-of-district placement and sent District employees to do so, and that the District had in the past contracted with outside professionals to perform evaluations. (Tr. 203–04.) The procedural safeguards notice the Parents received (which is not in the record) does not contain an express "limitation" on how far the District will travel to evaluate a child. (*Id.* at 199.) Dr. Mendelson reiterated his position that he thought it was unreasonable for the District to have to travel out-of-state to evaluate J.G. in this instance, and that it was the Parents who were "to make the child available for evaluation by the district." (*Id.* at 206, 241–42.)

### 2. *The April 17, 2008 CSE Meeting and the First IEP*

The CSE met on April 17, 2008 and produced J.G.'s first IEP. (DX 7, at 3 (hereinafter "4/17/08 IEP").) Present at the meeting were, among others, Dr. Mendelson, LaSalle, Dr. Collabolletta, Rodstein, the Parents, and Dr. Leventhal. (4/17/08 IEP, at 4.) The CSE reviewed an educational evaluation, a social history, a teacher report, J.G.'s transcripts and report cards, Dr. Leventhal's report, and Dr. Rabinowitz's January 16, 2008 letter. (4/17/08 IEP, at 5.)

After reviewing these materials, the CSE "quickly agreed that [J.G.] is a child with an emotional disturbance and required special education services." (4/17/08 IEP, at 5.) According to Dr. Mendelson, based on what it had reviewed, the CSE "felt that there was enough information to indicate that J.G. [was] a child with emotional disability, needing services." (Tr. 104.) [13] Mendelson then asked the

---

**13.** It does not appear that there was much discussion of this point, though the comments in the IEP do mention some talk about J.G.'s prior educational history. Dr. Collabolletta

noted that J.G. completed tenth grade with "satisfactory grades," but J.S. disagreed, noting that the "mostly 'B' grades" were "well below [J.G.]'s abilities." (4/17/08 IEP, at 4.)

Parents when J.G. would be returning, to which the Parents responded that it was uncertain, but that "she could return at anytime." (4/17/08 IEP, at 5.) The Parents "only wanted [J.G.] classified" at that point, but Dr. Mendelson responded that classification would require the District to offer a placement. (*Id.*)

The 4/17/08 IEP recommended placement of J.G. in a non-integrated special school in 12:1 classes. (4/17/08 IEP, at 1.) J.G. "require[d] special instruction in an environment with a small student-to-teacher ratio and minimal distractions in order to progress in achieving the learning standards." (*Id.* at 2.) J.G. would also participate in bi-weekly, individual thirty-minute therapy sessions and in a group therapy session once weekly. (4/17/08 IEP, at 1, 6.) The goals the IEP sought to achieve were J.G.'s regular school attendance, better study habits, timely completion of assignments, and improvement in her various emotional difficulties. (*Id.* at 6–7.)

The CSE agreed that even the relatively small A School, let alone the main Scarsdale High School, would not meet these requirements. (Tr. 106–07 (Mendelson); 4/17/08 IEP, at 5 (noting that the CSE rejected special education services at Scarsdale High School because "[a] more structured program is required").) The CSE therefore focused on out-of-District placements. Dr. Collabolletta said that "students with [J.G.'s] profile ha[d] often been successful at day treatment" facilities, and the CSE discussed possible placements at the STAR Program in White

Plains ("STAR"), a BOCES program for gifted students at Irvington High School in Irvington, New York ("BOCES"), and the Summit School ("Summit"). (4/17/08 /IEP, at 5; Tr. 107–08 (Mendelson); 782 (A.G.).) The CSE did not consider J.G.'s then-current placement at MA. (Tr. 109 (Mendelson).) The Parents were promised that the CSE would mail packages of information about J.G. to these programs. (4/17/08 IEP, at 5.) The Parents were also told that "most places, if not all places, [would] require an interview." (Tr. 111 (Mendelson).) The Parents apparently responded that they "want[ed] to see what the district can offer." (*Id.*)

It appears from the record that the District sent out information packets on J.G. to the placements discussed at the CSE meeting in early May 2008.[14] The record does not give a clear picture of what happened between April 17, 2008, and the dates the packets were sent, though J.S. did e-mail Susan LaSalle on May 4, 2008, with three goals to include in the IEP. (DX 22 (apologizing for "the delay").)[15] Although the Parents had requested a copy, the District does not appear to have mailed the Parents J.G.'s IEP until May 15, 2008, after it had sent copies to the recommended placements. (DX 7 (Letter from Dr. Mendelson to Parents (May 15, 2008) (enclosing IEP)); Tr. 781–82.) A.G. visited BOCES on May 16, 2008, and STAR on June 5, 2008.[16] (Tr. 782; DX 18 (Letter from Daniel Furry, Teacher Coord., STAR, to Mendelson (June 24, 2008)); DX 20 (Letter from Susan LaSalle

14. (DX 17 (Letter from JoAnn Doherty, Program Dir., STAR, to Susan LaSalle (May 7, 2008) (acknowledging receipt of referral)); DX 19 (Letter from Dr. Mendelson to Cathy Fragosa, BOCES (May 7, 2008) (enclosing referral packet)); DX 21 (Letter from Dr. Mendelson to Dir. of Admissions, Summit Sch. (May 7, 2008) (enclosing referral packet)).)

15. This e-mail prompted the 4/17/08 IEP to be revised on June 10, 2008. (DX 23; Tr. 123–24.) It appears that the only "revision" is the addition of J.S.'s requested goals. (DX 23.)

16. There was no vacancy in Summit's day program at the time J.G. was referred. (Tr. 119–20.)

to Parents (May 28, 2008)).) A.G. testified that he found neither of the two programs appropriate for J.G.: when he asked how they would deal with a student who would not get out of bed, he was told that bringing the student to school was the Parents' responsibility. (Tr. 782–83.) It appears the Parents still thought at this point that keeping J.G. at home would be unsafe. (*Id.* at 783.) According to a June 24, 2008 letter from STAR to Mendelson, at his visit A.G. indicated that J.G. was "not available for an intake," so STAR was unable to "proceed with the intake process." (DX 18.)

When BOCES expressed interest, LaSalle contacted the Parents on May 28, 2008, letting them know that BOCES was "very interested in meeting [J.G.]" and asking when she would be "available for an intake." (DX 20.) The record does not reflect any response to this letter, or that A.G. conveyed his concerns to the CSE.

### 3. The June 25, 2008 CSE Meeting, the Revised IEP, and the Summit School

The CSE met again on June 25, 2008. (DX 24, at 2 (hereinafter "6/25/08 IEP").) The purpose of this meeting was to "make a program recommendation for J.G." (6/25/08 IEP, at 4.) The minutes from the meeting indicate that the day programs A.G. had visited were discussed, and it was noted that "they cannot formally accept [J.G.] without an interview." (*Id.*) The CSE reviewed one new document: a June 25, 2008 progress report from MA. (*Id.*) This report indicated that J.G. was responding fairly well to MA, although "[l]ack of motivation and personal apathy

remain[ed] a daily risk." (DX 26, at 1 (Montana Academy progress report, dated June 25, 2008).) The MA report argued that only a "comprehensive environment such as Montana Academy" could offer the structure, supervision, and staff support that J.G. needed to get at her underlying emotional difficulties. (*Id.* at 2.) The CSE minutes reflect that J.S. also gave a progress report, stating that J.G. "ha[d] a long way to go" and that she needed "full time supervision." (6/25/08 IEP, at 4.) J.S. worried that J.G. would regress during the summer months. (*Id.*)

Based on these reports, the CSE changed J.G.'s recommended placement to a 12–month residential program (rather than a 10–month day program). (6/25/08 IEP at 1, 4.) It does not appear that any other changes were made from the earlier IEP. LaSalle indicated that "she was in contact with Summit and they told her that a spot should be available for [J.G.] for Summer 2008," and the CSE agreed to offer J.G. a placement at Summit. (*Id.* at 5.) The recommendation was made "pending the completion of the interview process," and the Parents were told that they would "need to go through the application process." (*Id.*) The CSE also promised to contact another program should J.G.'s "acceptance at Summit . . . fail." (*Id.*)[17]

There is nothing in the record providing a clear description of the program offered at Summit. No Summit representatives participated either in the CSE process or in the subsequent hearing. What the record does contain is the testimony of Dr. Mendelson and A.G. describing their expe-

---

17. Apparently, not everyone on the CSE thought Summit would be an appropriate placement for J.G. Rodstein testified that he had a conversation with the Parents indicating that he thought Summit would not be a good fit for her, based on "what [he] knew about J.G." and his own experience with the school and "its atmosphere, [and] engagement with students." (Tr. 379 (Rodstein).) Rodstein's testimony is unclear on when this conversation took place. (*Id.* at 375–76.) Rodstein never shared this view with Dr. Mendelson or anyone else on the CSE. (*Id.* at 378–79.)

riences of the program. According to Dr. Mendelson, Summit has day and residential programs "designed to address the needs of kids with emotional difficulties." (Tr. 150.) [18] Summit is accredited to provide education according to New York State standards, and its staff could, in Mendelson's view, provide the counseling required by J.G.'s IEP. (*Id.* at 150–51.) The District had had "other children similar to J.G." in their "emotional need[s]" attend Summit in the past, and Summit had "worked well" with them. (*Id.* at 151.)

A.G. visited Summit on July 15, 2008 and met with Deborah Sherwood ("Sherwood"), a school representative. (PX A, at 1 (Letter from J.S. to Susan LaSalle (July 28, 2008)).) A.G. came away with a number of concerns, which he described at the hearing:

> She [Sherwood] explained that the school is set up where the kids who are brighter and more . . . academically gifted are in a separate campus. . . . But there is less therapeutic support. But based on what I told her about [J.G.], . . . she said, [J.G.] would clearly not be able to go to that because she needs more therapeutic support. And as a result, she would be with kids who are slower, lower functioning kids, more acting out kids.

(Tr. 783–84.) Upon being told about J.G.'s experience at MA, Sherwood told A.G. that:

> [S]he also felt that it may be better for her to stay in Montana at this time than come and make a change to the program at Summit, out of her concern that if you take a child from a school where she is having success and bring her to a school where she might experience failure, that that could prove to be more damaging.

(*Id.* at 805.) A.G. also was concerned that students at Summit "followed the New York State Regents schedule of . . . seven periods with electives." (*Id.* at 784.) J.G. had not been able to handle such a program at Scarsdale, and she was having trouble even with the three classes she was then taking at MA. (*Id.*) Finally, A.G. testified that he thought Summit did not offer "as much therapy as . . . [J.G.] should be getting." (*Id.* at 785.)

Apparently notwithstanding the misgivings she expressed to A.G., Sherwood sent LaSalle an email two days after A.G.'s visit indicating that "we at Summit feel that [J.G.] could be an appropriate candidate for our residential program." (DX 27 (E-mail from Sherwood to LaSalle (July 17, 2008)).) "However," Sherwood continued, "we are unable to make a formal decision until we are able to conduct an intake with [J.G.]. [A.G.] . . . did not have dates or estimates as to when [J.G.] will return from Montana." (*Id.*) Sherwood had told A.G. at their meeting that "she would have to interview [J.G.]" if the Parents were interested in "mak[ing] th[e] transition" from MA to Summit. (Tr. 805.) The record does not reflect what, if anything, LaSalle or any other District staff member did to follow up on Sherwood's e-mail.

On July 28, 2008, the Parents sent a letter to LaSalle expressing their belief that "[t]he Summit School will not suffice for [J.G.'s] needs at this time." (PX A, at 1 (Letter from J.S. to LaSalle (July 28, 2008)).) The Parents described two main areas of concern. First, Summit "serves a very mixed population of students," including some who were autistic, who acted out, or had other problems. (*Id.*) The "high-functioning students" took the New York State Regents curriculum, consisting of

---

**18.** Summit apparently has multiple campuses. The location considered for J.G. is in Nyack, New York. (Tr. 783.)

seven periods a day including electives. (*Id.*) In the Parents' view, J.G. could not handle "a full high school course load." (*Id.*) J.G. was even having difficulty keeping up with the assignments in the three classes she was then taking at MA. (*Id.*) The Parents feared that J.G. would fail to keep up at Summit, which would then reinforce the emotional problems from which she suffered. (*Id.* at 2.) "Ms. Sherwood agreed with [A.G.] that this was a reasonable and compassionate concern." (*Id.*) Second, the Parents felt that Summit offered less therapy than the IEP called for and that J.G. required. (*Id.*) Again, the District does not appear to have taken any action or sent any response to this letter. (Tr. 787–88 (A.G.).)

A.G. was contacted by another school, Harmony Heights, in summer 2008, seeking to make an appointment with the family. (Tr. 809–10.) When A.G. returned the school's call, he was told that "there would be no reason to come for a visit unless [A.G.] had [J.G.] with [him] to come for a visit. . . ." (*Id.* at 810.)

According to A.G., had the District recommended a program that the Parents thought appropriate for J.G., they "would have brought [J.G.] home like this." (*Id.*) "[I]f the committee offered a school that met the needs of our daughter, we would much prefer to have her home or closer to home than in Montana." (*Id.*)

On August 18, 2008, the Parents' counsel sent LaSalle a letter informing her that the Parents were placing J.G. at MA for the 2008–2009 school year, and that they "intend to seek funding for this placement from the District." (DX 25 (Letter from Jesse Cole Foley to LaSalle (Aug. 18, 2008)).)

## G. J.G.'s Progress at Montana Academy

At the time of the hearing, J.G. was in attendance at MA. McKinnon and Carol Minnick Santa ("Santa"), MA's co-owner and director of education, testified for the Parents on March 31, 2009. (Tr. 461, 552.) MA is a high school on a ranch, housing seventy students and nearly seventy staff members. (*Id.* at 468–69 (McKinnon).) The school offers a full academic curriculum, with the goal of an individual student's program being to fill in those credits he or she needs to graduate according to Montana and California State education standards. (*Id.* at 471 (McKinnon); 556–59 (Santa).) Classes contain between four and twelve students. (*Id.* at 557.) On a typical weekday, students take classes in the mornings and have a "study hall" in the mornings, engage in group therapy and "tutorial"—individual academic study or interaction with teachers—in the afternoon, and have organized sports, chores, and more study time in the late afternoon and evening. (*Id.* at 489–92, 561, 564.) On weekends, the students engage in activities in groups organized according to their progress in the clinical program. (*Id.* at 491.) In that program, students have "intensive" therapy daily, either individually, in groups, or with their families by phone. (*Id.* at 479–81.) Each Friday, the teachers meet together and every student's academic progress for the week is reviewed. (*Id.* at 493, 578.) Students are closely monitored, and a student who fails to turn in homework or who has poor grades in a class is "shut out" of weekend activities and forced to attend extra study hall. (*Id.* at 565–66.) The school also runs a program to transition students nearing the end of the program by integrating them in the larger community, through courses at a local community college and through outside jobs. (*Id.* at 469–70.) Students can graduate from MA directly, or if a student finishes the MA clinical program before achieving sufficient credits

to graduate high school, she returns to her home school to complete her academics. (*Id.* at 471–72.) Tuition at MA is approximately $6,500 per month. (*Id.* at 508.)

MA students come from different types of schools, but they are united by what McKinnon called a "developmental delay of sort of relative maturity." (Tr. 474.) Most MA students are "academically disengaged" on arrival, but are not in need of remediation—they are capable of "do[ing] school fairly well." (*Id.* at 562 (Santa).) Some MA students have "become ... dysfunctional" or dropped out at their home schools, while others have been expelled. (*Id.* at 474 (McKinnon).) Seventy-five to eighty percent of MA students have had "significant exposure to alcohol or marijuana" before they get to the school, but MA "do[es] not consider [itself] a drug rehab center" and is "not primarily a substance abuse program," according to McKinnon. (*Id.* at 514–15.)

MA students are "not allowed ... to go home and visit family ... as part of the routine program," until they are promoted internally to the clinical program's middle group (or "clan," in MA parlance). (Tr. 530.) This can take months for some students. (*Id.* at 530–31.) Instead, parents visit the school and can take their children on short vacations. (*Id.* at 530.) McKinnon testified that as students get more advanced in the clinical program, the school encouraged returning periodically to their homes and "peer group[s]" there, because "we want kids to try and have trouble and fail and have ways to come back and digest that experience and try it before we finally send them home." (*Id.* at 530–31.)

When she arrived at MA, J.G. presented a fairly typical "picture" among students at the school. (Tr. 485–86.) McKinnon

supervised a small group of students that J.G. was in. (*Id.* at 465.) He testified that she was doing "very well." She had a "rocky start," but had become "popular and liked by her team and by other kids." J.G. had "reconciled" with her family and had progressed in her therapy to the point where McKinnon felt she showed "every sign of growing up and becoming thoughtful and capable of planning and carrying through with her plans." (*Id.* at 499.) J.G. was "off all of her antidepresent medication[s] ... and [was] doing very well without them." (*Id.* at 505.) J.G. was expected to graduate in the summer of 2009 and begin college in the fall, as she had applied to colleges largely on her own. (*Id.* at 499–500, 531–32.) Academically, although J.G. initially had "some trouble getting in homework," she was doing "quite well" and "achieving well in every area," according to Santa. (*Id.* at 578.) J.G. had recently won an academic achievement award in literature. (*Id.* at 502 (McKinnon).) J.G.'s grades in MA classes were almost all As, A-'s, or B+'s. (PX B (High School Credit History, Fall 2008, Montana Academy).)

### H. Procedural Background

#### 1. IHO

On October 22, 2008, the Parents, through counsel, sent the District a request for an impartial hearing regarding J.G. and seeking reimbursement for her placement at MA. As a proposed "resolution" to their claim, the Parents proposed that the District reimburse them for any tuition that had been or would be paid for the period between April 4, 2008 and June 30, 2009.[19] (DX 28, at 1, 3 (Letter from Jesse Cole Foley to LaSalle (Oct. 22, 2008)).) The Parties waived a resolution meeting, and the IHO held a four-day hearing on December 10, 2008, and March

19. April 4, 2008 is the date on which J.G. enrolled at MA. (PX E.)

17, March 31, and April 24, 2009. The IHO heard testimony from Mendelson, Rodstein, Maxwell, McKinnon, Santa, Leventhal, and A.G., and compiled a record of forty-nine exhibits.

The IHO issued her decision June 6, 2009 rejecting the Parents' request for tuition reimbursement. First, the IHO found that the District had not violated its obligations under IDEA's "child find" provisions, because "[g]iven [J.G.'s] prior academic history and the parents [*sic*] provision of psychiatric/medical services (including a course of cognitive behavioral therapy, medication and medical monitoring) ... the [District] did not have sufficient reason to suspect that special education services were needed" prior to J.G.'s withdrawal from the District. (IHO Decision 16.) Next, the IHO found that J.G.'s IEP, as developed in April and modified in June 2008, was "properly and timely developed" and substantively appropriate for J.G.'s needs. (*Id.*) However, the District had failed to establish that it provided J.G. a FAPE because nothing in the record substantiated the appropriateness of the Summit School specifically. (*Id.* at 16–17.) Third, the IHO found that although MA was a "very restrictive setting," it was an appropriate placement for J.G. given her "meaningful academic growth" while there. (*Id.* at 18.)

Finally, the IHO found that equitable considerations barred an award of tuition reimbursement. The Parents cooperated in the CSE process to the extent that they attended the IEP meetings, provided the CSE with Dr. Leventhal's report, and visited the CSE's recommended placements. But, the IHO noted, the Parents "failed to cooperate in good faith" with the District by refusing to "provide [J.G.] for an initial evaluation and subsequently for interview during the intake process." (*Id.* at 18–19.) The IHO found that there was nothing in the record suggesting J.G. could not attend an interview at Summit, and the Parents' decision not to have J.G. interview was therefore unreasonable. (*Id.* at 19.)

### 2. SRO

The Parents and District timely filed appeals and cross-appeals to an SRO. The SRO, on August 19, 2009, affirmed the IHO's decision in each respect. *See* Application of a Student with a Disability (No. 09–083). The District cross-appealed the IHO's findings that it had failed to provide J.G. a FAPE and that MA was an appropriate placement for J.G., and it took issue with the IHO's failure to rule that the District had no responsibility at all for J.G.'s special education once she was withdrawn from the District in January 2008. (SRO Decision 13–14, 18.) On the child find provisions, the SRO concluded that the issue was moot because the District did not have a right to appeal a favorable decision of the IHO, and because the District did in fact classify J.G. as a child with a disability in January 2008. (*Id.* at 13.)[20] On the issue of whether the District provided J.G. with a FAPE, neither party appealed the IHO's finding that the program recommended by the IEP, including a residential program, small class sizes, and therapy, was appropriate for J.G. (*Id.* at 13–14.) The SRO agreed with the IHO's ultimate conclusion, however, that the hearing record contained insufficient information about Summit and whether it could implement J.G.'s IEP. The District argued that it could not have demonstrated Summit's appropriateness because the

---

**20.** At oral argument before this Court, Plaintiffs' counsel acknowledged that Plaintiffs did not appeal the portion of the IHO's decision that found that the District did not violate its child find obligations, and thus that they had waived any objection to the IHO's conclusion on this issue.

Parents refused to have J.G. interview there. But, the SRO held, this was a concession that the District had not demonstrated how Summit could have implemented J.G.'s IEP. Moreover, the SRO noted, no one from Summit attended the CSE meetings. (*Id.* at 14.)

As for MA's appropriateness, the District argued that the hearing record contained insufficient information regarding the other students attending the school, and that J.G. continued to have academic difficulties after arriving there. (*Id.* at 16.) The SRO thoroughly reviewed the evidence on MA's program and J.G.'s progress there, and concluded that the Parents had adequately demonstrated that MA "addressed the student's special education needs" and that J.G. had made progress there "in her educational and therapeutic programs." (*Id.* at 18.)

Finally, the SRO addressed the equities of a reimbursement award and concluded that no award should be allowed for essentially two reasons. First, the evidence showed that, at least as of February 2008, when the Parents applied to MA, the Parents had no intention of removing J.G. from MA and accepting any placement the District might recommend for the 2008–2009 school year. (*Id.* at 19–20.) Second, the Parents gave the District inadequate notice of their intent to enroll J.G. at MA for the 2008–2009 school year and seek tuition reimbursement. (*Id.* at 20.)

*3. The Present Action*

This case was filed on November 17, 2009. (Dkt. No. 1.) The Parties served summary judgment motions on each other on January 12, 2011, and the motions were fully submitted on February 9, 2011. (Dkt. No. 10.) The Court heard oral argument on September 28, 2011.

*II. Discussion*

*A. Tuition Reimbursement Under the IDEA*

■ The IDEA requires that states receiving federal funds provide a "free appropriate public education" to "all children with disabilities." 20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (describing the IDEA's predecessor statute as an "ambitious federal effort to promote the education of handicapped children"). A school district within such a state provides a "free appropriate public education" ("FAPE") when it offers "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.' " *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir.1998) (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034) (citation and internal quotation marks omitted). These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education." *Polera v. Bd. of Educ.,* 288 F.3d 478, 482 (2d Cir.2002); *see also* 20 U.S.C. § 1414(d)(1)(A)-(B), (d)(3) (requirements for IEPs and their development).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A).

■ The Supreme Court has repeatedly held that if a state fails in its obligation to

provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from school districts for the private placement of the child. *See Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 129 S.Ct. 2484, 2496, 174 L.Ed.2d 168 (2009); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The source of this ability is 20 U.S.C. § 1415(i)(2)(C)(iii), which allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate." *See Forest Grove,* 129 S.Ct. at 2490–91. However, parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at their own financial risk. *See A.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir.2009). In deciding whether tuition reimbursement for such a private placement is warranted, a court must first consider whether (1) "the state has complied with the procedures set forth in the IDEA," and (2) the IEP developed "through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." If the answer to these questions is "yes," no reimbursement is permissible. If "no," the court then considers whether (3) "the private schooling obtained by the parents is appropriate to the child's needs." *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 192 (2d Cir.2005) (citation and internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 417 (2d Cir.2009). If it is, "equitable considerations" must "support the [Parents'] claim." *A.D. v. Bd. of Educ.,* 690 F.Supp.2d 193, 205 (S.D.N.Y.2010); *see also Frank G. v. Bd. of Educ.,* 459 F.3d 356, 363–64 (2d Cir.2006) (" '[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.' " (second alteration in original) (quoting *Burlington,* 471 U.S. at 374, 105 S.Ct. 1996)). Because the Court may order only "such relief" as it deems "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment . . . ." (emphasis added)), the Court "enjoys broad discretion in considering equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 112 (2d Cir.2007) (citing *Carter,* 510 U.S. at 16, 114 S.Ct. 361); *see also, e.g., E.Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ.,* 763 F.Supp.2d 584, 595 (S.D.N.Y.2011) (same); *M.H. v. N.Y.C. Dep't of Educ.,* 712 F.Supp.2d 125, 148 (S.D.N.Y.2010) (same).

*B. Standard of Review*

■ Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See, e.g., T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 252 (2d Cir.2009); *Viola v. Arlington Cent. Sch. Dist.,* 414 F.Supp.2d 366, 377 (S.D.N.Y.2006). Instead, summary judgment in IDEA cases such as this is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir.2005) (internal quotation marks omitted).

■ This posture means that this Court owes "a significant degree of deference to the state educational agency, as [it is] essentially acting in an administrative-law-style capacity." *P. ex rel. Mr. P. v. Newington Bd. of Educ.,* 546 F.3d 111, 118

(2d Cir.2008). The Court must "give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Gagliardo*, 489 F.3d at 113 (second alteration in original) (quoting *Rowley*, 458 U.S. at 206, 208, 102 S.Ct. 3034); *see also Cerra*, 427 F.3d at 191 ("[T]he IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."). Therefore, this Court may not "substitute [its] own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. However, the deference owed to the administrative decisions may be "less weighty" when it comes to reviewing whether the equities support a reimbursement award. *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F.Supp.2d 497, 503 (S.D.N.Y. 2011) (explaining that district courts have "particular expertise" and "broad discretion" when engaging in a "balancing of the equities"). Courts reviewing administrative decisions under the IDEA must determine whether they are "reasoned and supported by the record," *Gagliardo*, 489 F.3d at 114, applying a "preponderance of the evidence" standard. 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003).

### C. Analysis

#### 1. The District's Child Find Obligations

The Parties dispute each element of the test for tuition reimbursement in this appeal. But first, the Court must address a preliminary issue: whether the District had an obligation, either before or after the Parents requested on January 25, 2008 that the CSE convene to evaluate J.G. as a child with a disability. Resolving this question is necessary for two reasons:

First, the District presses a threshold argument, which it has made since the commencement of proceedings before the IHO, that it had no obligations whatsoever to J.G. after she was unilaterally withdrawn from the District in January 2008. (Tr. 8; Mem. of Law in Supp. of Def.'s S.J. Mot. ("Dist. Mem.").5.) Second, while Plaintiffs' counsel conceded at oral argument that Plaintiffs had waived any claim that the District violated the IDEA's child find requirements, he suggested that the District's failure to evaluate J.G. before January 2008 is a factor that should weigh in this Court's review of whether a reimbursement award is supported by equitable considerations. The Court concludes that both arguments lack merit. Specifically, the IDEA and New York State law do not, at least in the circumstances of this case, divest a district in which a child's parents reside of its obligations to provide the child a FAPE even though the child attends private school outside the district. Second, even though the Parents waived the argument, review of the record confirms that the District had no obligation to identify and evaluate J.G. before January 25, 2008. The Parents' position that the District's conduct before then should weigh in the equitable calculus is puzzling, given that the IHO also concluded that the District did not have any such obligation, and the Parents chose not to appeal that finding. The Court does not understand how the Parents can concede that the District did nothing to violate the IDEA prior to January 25, 2008, but also ask this Court to find the District's conduct during that time to be "inequitable."

##### a. Applicable Law and the District's Defense

■ Under the IDEA, each state receiving federal funds must "ha[ve] in effect policies and procedures," 20 U.S.C. § 1412(a), by which it will identify, locate,

and evaluate "[a]ll children with disabilities residing in the State" to determine whether these children require special education and related services. *Id.* § 1412(a)(3)(A); *see also Handberry v. Thompson,* 446 F.3d 335, 347 (2d Cir.2006); *A.P. ex rel. Powers v. Woodstock Bd. of Educ.,* 572 F.Supp.2d 221, 224 (D.Conn.2008) (describing "child find" obligations). This "child find" obligation extends also to children "who are suspected of being a child with a disability ... and in need of special education, even though they are advancing from grade to grade...." 34 C.F.R. § 300.111(c)(1); *see also Bd. of Educ. v. L.M.,* 478 F.3d 307, 313 (6th Cir.2007) (noting that § 300.111(c) extends the IDEA's "child find" requirement to children "only suspected of having a disability"); *Dean v. Sch. Dist. of Niagara Falls,* 615 F.Supp.2d 63, 71 (W.D.N.Y. 2009) (same); *A.P.,* 572 F.Supp.2d at 224–25 (same). Thus, courts have held that a state's child find duty is "triggered" when it "has a reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability." *New Paltz Cent. Sch. Dist. v. St. Pierre,* 307 F.Supp.2d 394, 400 n. 13 (N.D.N.Y.2004); *see also Murphy v. Town of Wallingford,* No. 10–CV–278, 2011 WL 1106234, at *3 (D.Conn. Mar. 23, 2011) ("Once a school has reason to suspect a disability, the school must conduct an evaluation of the child within a reasonable time." (internal quotation marks omitted)); *Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M.,* No. 07–CV1484, 2009 WL 2514064, at *8 (D.Conn. Aug. 7, 2009) (same); *El Paso Indep. Sch. Dist. v. Richard R.,* 567 F.Supp.2d 918, 950 (W.D.Tex. 2008) (collecting cases). "However, the IDEA is not an absolute liability statute and the 'Child Find' provision does not ensure that every child with a disability will be found." *A.P.,* 572 F.Supp.2d at 225 (citing *L.M.,* 478 F.3d at 313).

The IDEA contains a separate sub-section titled "Children in private schools." 20 U.S.C. § 1412(a)(10). This sub-section requires states receiving federal funds to provide special education and related services to "children with disabilities in the State who are enrolled by their parents in private elementary and secondary schools." *Id.* § 1412(a)(10)(A). Under this provision, "states are required to provide to children voluntarily enrolled in private schools only those services that can be purchased with a proportionate amount of the federal funds received" under Part B of the IDEA. *Russman v. Bd. of Educ. of Watervliet,* 150 F.3d 219, 221 (2d Cir. 1998). The same child-find requirement applicable to public school children also applies to privately placed children. *See* 20 U.S.C. § 1412(a)(10)(A)(ii)(I). The goal of this child find process is to "ensure the equitable participation of parentally placed private school children with disabilities and an accurate count of such children." *Id.* § 1412(a)(10)(A)(ii)(II). Federal regulations provide that each local school district's child find obligations extend to "children with disabilities who are enrolled by their parents in private, including religious, elementary schools and secondary schools *located in the school district served by* the [local education agency]." 34 C.F.R. § 300.131(a) (emphasis added). This obligation also extends to "parentally-placed private school children who reside in a State other than the State in which the private schools that they attend are located." *Id.* § 300.131(f).

From these provisions, the District builds the argument that "if a child has been parentally placed in a private school, the local education agency where the child attends private school (*not where the child's Parents reside* )" is obliged to initiate child-find and provide services to any children with disabilities it identifies. (Dist. Mem. 5 (emphasis added).) The District

argues that New York law requires the same result. (*Id.;* Mem. of Law in Opp'n to Pls.' S.J. Mot. ("Dist. Opp'n") 3, 5.) Therefore, once J.G. was removed from the District and enrolled in True North, on January 14, 2008, the District's obligation to identify J.G. ceased and shifted, first to the Vermont school district where True North is located and then to the school district encompassing MA. (Dist. Mem. 5–6.) The District does not cite any cases adopting this view.

### b. The District's Obligations Prior to January 25, 2008

■ The Parents' impartial hearing request contended that "the district failed in their [*sic*] Child Find obligation, in that they [*sic*] failed to identify the student in a timely fashion and provide appropriate special education services in a timely fashion, despite having knowledge that she might require such services." (DX 28, at 3.) The IHO, based on her review of the record, rejected this argument: she concluded that J.G.'s performance and attendance deteriorated in fall of her sophomore year, but that J.G. had "rebound[ed] and demonstrated educational success" by spring. (IHO Decision 15.) When J.G.'s attendance declined again in November 2007, "[t]he district worked diligently with the parents and the student during this period from November to January 2008" to help J.G. regain her "footing." (*Id.*) According to the IHO, the District did not have sufficient reason to suspect J.G. was a child with a disability needing special

education services before January 2008 based on her "academic history" and the course of psychiatry J.G. was undergoing in the fall and winter of 2007 to 2008. (*Id.* at 16.)

■ The IHO's finding is supported by a preponderance of the evidence. To have failed its obligation to identify students with disabilities, the District must have "overlooked clear signs of disability" or been "negligent in failing to order testing," or there must have been "no rational justification for not deciding to evaluate." *L.M.,* 478 F.3d at 313 (internal quotation marks omitted); *see also Sch. Bd. of Norfolk v. Brown,* 769 F.Supp.2d 928, 942–43 (E.D.Va.2010) (same); *A.P.,* 572 F.Supp.2d at 225 (same); *Clay T. v. Walton Cnty. Sch. Dist.,* 952 F.Supp. 817, 823 (M.D.Ga. 1997) (same). Apart from the deference owed to the IHO, this Court also owes deference to "the evaluations of [J.G.'s] teachers and the school officials," because the Court "does not have the expertise or experience in the field of education . . . and does not have the opportunity to observe a student's classroom behavior over a period of months as [her] teachers do." *Clay T.,* 952 F.Supp. at 823. And, of course, "[a]ctions of . . . school systems cannot be judged exclusively in hindsight." *Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999) (quoting *Fuhrmann v. E. Hanover Bd. of Educ.,* 993 F.2d 1031, 1041 (3d Cir.1993)) (alterations omitted).[21]

The District was required to identify those children who were "suspected of be-

---

21. Therefore, that the District ultimately did classify J.G. as disabled after the CSE process began, or that Rodstein testified that in hindsight he wished he had had J.G. evaluated earlier, are of limited, if any, relevance to the District's obligations *before* J.G. had been withdrawn from the District by the Parents. *Cf. D.K. v. Abington Sch. Dist.,* No. 08–CV–4914, 2010 WL 1223596, at *6 (E.D.Pa. Mar. 25, 2010) ("[E]ven though [the evaluating

doctor] acknowledged in hindsight that [the student] did exhibit some behaviors consistent with ADHD prior to his diagnosis, this disclosure does little to inform the Court's current analysis, given the complexities of an ADHD diagnosis, coupled with the assessment that [student] also exhibited general behavioral characteristics typical of five or six year old children.").

ing a child with a disability ... and in need of special education." 34 C.F.R. § 300.111(c)(1). "Under the IDEA, the term 'children with disabilities' means, among others, children with a 'serious emotional disturbance ... who, by reason thereof, *need special education* and related services.'" *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 65 (2d Cir.2000) (emphasis in original) (quoting predecessor to 20 U.S.C. § 1401(3)(A)). An "emotional disturbance" is defined as:

> [A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance:
>
> (i) an inability to learn that cannot be explained by intellectual, sensory, or health factors;
>
> (ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
>
> (iii) inappropriate types of behavior or feelings under normal circumstances;
>
> (iv) a generally pervasive mood of unhappiness or depression; or
>
> (v) a tendency to develop physical symptoms or fears associated with personal or school problems.

N.Y. COMP. CODES R. & REGS. 8 § 200.1(zz)(4); *see also* 34 C.F.R. § 300.8(c)(4) (same).[22]

The record overall supports the IHO's bottom line conclusion that given J.G.'s level of academic achievement and the in-tervention of her Parents and the District during her periods of decline, the District did not have sufficient reason to believe J.G. had a disability prior to January 2008. (IHO Decision 16.) Because the Parents are faulting the District for not evaluating J.G. in a timely manner, the Court must focus on what the District knew and when. To begin, J.G.'s "educational performance" (at a macro level at least) did not measurably decrease between her freshman year, when no one argues she should have been suspected of having a disability, and sophomore year, even though it was then that her disability appears to have first manifested itself. (DX 32 (transcript including both freshman and sophomore grades).)[23] Moreover, J.G. appears to have come out of the bad patch she was going through in fall 2006 by January 2007, when, according to the evidence, she regained self-confidence at her internship and caught up on her work. (DX 31, at 10–13; Tr. 305–06 (Rodstein).) J.G.'s year-end evaluations (including her own) are uniform in their assessment that J.G. had a successful second semester and finished the year strongly. (DX 31, at 3–7.)

In her Junior year, J.G.'s academic decline became more noticeable, and J.G. dropped Latin in October. Notably, however, J.G.'s attendance and homework problems came on gradually—Mendelson described J.G.'s absences as not becoming problematic until November (Tr. 23)—and even by November, her teachers were split over whether there was any reason to

---

22. The Parents identify no other disability from which the District should have suspected J.G. was suffering, and the evidence does not suggest any. *See* N.Y. COMP.CODES R. & REGS. 8 § 200.1(zz)(1)-(13).

23. There is some indication in the record that J.G.'s grades did not meet her Parents' expectations and that the Parents thought J.G.'s performance level was evidence of her disability. (Tr. 136 (Mendelson, describing the 6/5/08 IEP meeting) ("[W]hen we were referred to the transcript, B's are not good enough or given her—given her cognitive ability, she—Ms. S. [J.S.] did not see a B as being an appropriate level of functioning.").) It bears noting that J.G. had around a B+ average her freshman year, before anyone thought she might have been disabled. (DX 32.)

worry about J.G. unduly. (*Id.* at 444 (Maxwell).) Maxwell testified several times that J.G.'s difficulty in keeping up with her assignments was not unusual among first-semester juniors at the A School, and that five or six other kids were having similar problems at the time. Socially, and in terms of J.G.'s mood, the evidence was also inconclusive. According to Rodstein, J.G. had been emotional in the past in advisor meetings, but this was not unusual. (*Id.* at 346–47.) It was apparent to Rodstein by mid-November 2007 that J.G. was getting worse—in his words, she was getting more "negative," "less talkative," and she began to "shut down." (*Id.* at 330.) Maxwell, on the other hand, who taught J.G. in two classes, did not notice anything that worried her about J.G.'s emotional state or behavior from her interactions with her in the classroom. (*Id.* at 439, 444–45.) And, just prior to the decline described by Rodstein in his meetings with her, J.G. had attended two school trips—to Massachusetts and to Denver—and the evidence uniformly supports the conclusion that J.G. had been happy and had a good time on both of these trips, and that she had done well, both socially and in terms of her performance at the Denver conference. (*Id.* at 326–29 (Rodstein); 437–39 (Maxwell).)

By December 2007, the record shows that J.G. was having major difficulties getting out of bed to go to school. (Tr. 750 (A.G.).) But, J.G. was still completing some assignments, including the major English research paper that caused problems for several A School students. (*Id.* at 359–60 (Rodstein).) Undeniably, some of her teachers were, by the end of the calendar year, worried about J.G.'s academic performance. (DX 37; Tr. 444–45 (Maxwell) ("I was worried about her academically because she had fallen behind. I thought she would probably recover once we were past the research paper.").) But

any academic decline J.G. showed by the end of the semester was less severe than those identified by courts that have found emotional disturbances impacting "educational performance." *See Mr. N.C. v. Bedford Cent. Sch. Dist.,* 300 Fed.Appx. 11, 13 (2d Cir.2008) (summary order) (collecting cases involving students failing classes or experiencing large GPA declines). The IDEA's child find provisions do not require districts to evaluate as potentially "disabled" any child who is having academic difficulties. *A.P.,* 572 F.Supp.2d at 225.

Moreover, even if the District should have known at this point that J.G. had an emotional disturbance—as opposed to thinking she was merely going through a difficult time in her life—the IDEA's child find requirement only applies to children who are disabled *and* in need of special education and related services. *See* 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111(c)(1); *Taylor v. Altoona Area Sch. Dist.,* 737 F.Supp.2d 474, 484 (W.D.Pa.2010); *A.P.,* 572 F.Supp.2d at 225. The District knew that J.G. had begun therapy after the Tylenol incident in her sophomore year, and that she had bounced back following the winter break that year. The evidence does not suggest that J.G.'s decline in November and December 2007 was so different from what had happened the previous year that the District should have known that the Parents' interventions would not have worked, or should have known that J.G. needed services to recover. Nor, finally, did the District take no action in response to J.G.'s decline—Rodstein kept in close contact with the Parents, and J.G. was allowed to drop Latin in her junior year. *Cf. A.P.,* 572 F.Supp.2d at 225–26 (district did not violate child find obligation where student was making progress and teacher commu-

nicated regularly with parent and intervened with attempts to help child succeed).

It is true that the Parents informed Rodstein about J.G.'s Tylenol overdose in October 2006, and that, according to A.G., Rodstein was kept well informed of J.G.'s continuing inability to get out of bed. (Tr. 732–33.) A suicide attempt and repeated truancy might qualify as "inappropriate types of behavior or feelings under normal circumstances." N.Y. COMP. CODES R. & REGS. 8 § 200.1(zz)(4)(iii); *see Integrated Design & Electronics Acad. Pub. Charter Sch. v. McKinley,* 570 F.Supp.2d 28, 35 (D.D.C.2008) (holding that "a suicide attempt and psychiatric hospitalization" are clearly "inappropriate types of behavior"). But, besides the fact that J.G. did not, so far as the District reasonably should have known, suffer from her emotional difficulties "to a marked degree" adversely affecting her educational performance, J.G. also did not suffer from these problems "over a long period of time." N.Y. COMP. CODES R. & REGS. 8 § 200.1(zz)(4). *Cf. Muller ex rel. Muller v. Comm. on Special Educ.,* 145 F.3d 95, 103–04 (2d Cir.1998) (holding child suffered from emotional disturbance where she exhibited several symptoms from first through ninth grade). From the perspective of Rodstein or any other District representative, the emotional difficulties J.G. had faced sophomore year were temporary and not uncommon. Again, nothing suggested their recurrence in late fall 2007 would be more permanent—at least not before J.G. was withdrawn from the District.

There is one arguably troubling fact for the District: the sophomore year ('06–'07) conversation between either A.G. or J.S. and Dr. Collabolletta, in which, the Parents allege, Dr. Collabolletta responded to the Parents' question about testing J.G. that based on J.G.'s grade average and the fact that she would be a junior the next year, testing was not necessary. (Tr. 729; DX 8, at 2.) A parent's request triggers a local education agency's obligation to do an initial evaluation. 20 U.S.C. § 1414(a)(1)(B). But the evidence on what happened at this conversation is unclear in terms of what was asked of Dr. Collabolletta and even who participated in the conversation and when.[24] What the Court can tell from the record about this conversation does not outweigh the other evidence supporting the IHO's conclusion that the District did not violate its child find obligations.

### c. The District's Obligations After J.G.'s Withdrawal

 The question then is whether the District had any obligation to J.G. at all *after* she was removed from the District and enrolled at True North on January 13, 2008, when it did not have any obligations prior to that point.[25] While the issue is not free from doubt, the Court cannot accept the District's argument that it had none.

Children who are privately placed by their parents are governed by a separate framework under the IDEA from those children who remain in the public schools. *See Bd. of Educ. of Appoquinimink Sch.*

---

**24.** A.G. testified that he had the conversation with Dr. Collabolletta in "Spring of the sophomore year." (Tr. 728.) J.G.'s educational history, which was based on an interview with J. S., suggests that it was J.S. who talked to Dr. Collabolletta around the time of J.G.'s Tylenol overdose (which happened in October 2006). (DX 8, at 2.)

**25.** Parenthetically, the District does not explain why, even if the Court accepted its argument, it would be absolved of paying tuition reimbursement in this case, because the District ultimately *did* classify J.G., engage in the CSE process, and offer J.G. a placement for the 2008–2009 school year.

*Dist. v. Johnson,* 543 F.Supp.2d 351, 358 (D.Del.2008); *see also Russman,* 150 F.3d at 221 ("States are ... not obligated under the [IDEA] to expend their own funds on disabled children who have voluntarily enrolled in private school."). As noted, for privately placed children, states are provided federal funds, and local school districts are required to allocate a proportional share of those funds to privately placed children with disabilities in an amount determined by the number of such children compared with the total number of disabled children in the district as a whole. *See* 20 U.S.C. §§ 1412(a)(10)(A)(i)-(ii); 34 C.F.R. §§ 300.131–300.133; *Russman,* 150 F.3d at 221. *See generally Appoquinimink,* 543 F.Supp.2d at 357–58. This is where the child find provisions cited by the District come in: local school districts must engage in child find activities with respect to children placed in private schools located within the district in order to ensure "[t]he equitable participation" of such children in the services the district provides, and to get an "accurate count of those children" for determining the correct amount of funds to be expended. 20 U.S.C. § 1412(a)(10)(A)(ii)(II); 34 C.F.R. § 300.131(b).

One could read the structure of the IDEA and its implementing regulations as divesting a district of residence of its responsibility to provide special education and related services (and therefore to pay for them to be provided elsewhere) once a parent unilaterally places a child in an out-of-district private placement, at least where the district offered the child a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C)(i) (providing that a local educational agency is "not require[d]" to "pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elect-

ed to place the child in such private school or facility"); 34 C.F.R. § 300.137(a) ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school."). Indeed, the situation described in section 1412(a)(10)(C)(i) looks somewhat like this case, in which the District, because it was not obligated under child find to evaluate J.G. while she was still a public school student, "made a [FAPE] available," but the Parents still "elected to place the child in [a] private school."

But what happens when, as here, parents who have privately placed their child seek a FAPE from the district in which the parents continue to reside? The few cases discussing this or similar situations suggest that a district-of-residence's obligations do not simply end because a child has been privately placed elsewhere, as the District argues—rather, the IDEA's obligations may be shared. *See Regional Sch. Dist. No. 9,* 2009 WL 2514064, at *10–11 (rejecting analogous argument that court lacked subject matter jurisdiction over tuition reimbursement claim where student had not attended public school prior to private placement, because IDEA did not divest district of responsibilities where it was on notice that child was potential student); *District of Columbia v. Abramson,* 493 F.Supp.2d 80, 85–86 (D.D.C.2007) (holding, where parent requested special education services but subsequently placed student in out-of-district private school, and district refused to continue the IDEA process, that district was not divested of its responsibility under the IDEA even though the district-of-location might have one as well); *Ms. K. v. Me. Sch. Admin. Dist. No. 40,* No. 06–CV–42–P–H, 2006 WL 3081555, at *13–14 (D.Me. Oct. 26, 2006) (rejecting analogous argument and

holding that administrative hearing officer erred in "relieving [district] of all responsibility" for implementing IEP where student was privately placed out of district); *cf. J.P.E.H. ex rel. Campbell v. Hooksett Sch. Dist.*, No. 07–CV–276, 2008 WL 4681827, at *2 (D.N.H. Oct. 22, 2008) (holding, where student alleged denial of FAPE by public school district and subsequently enrolled in out-of-district private school, that "IDEA remedies" must be dismissed, but tuition reimbursement claim could go forward). The U.S. Department of Education apparently takes the same view: Under the IDEA, parents may seek equitable services from the district of location, and a FAPE from the district of residence. *See Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities*, 71 Fed.Reg. 46540, 46593 (Aug. 14, 2006) (noting that "because most States generally allocate the responsibility for making FAPE available to the LEA in which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time," and that "nothing in this part ... would prohibit parents" from doing so); Letter from Patricia J. Guard, Acting Dir., Office of Special Educ. Programs, U.S. Dep't of Educ., to Michael J. Eig, Esq., at 2 (Jan. 28, 2009) (noting, where student resided in Maryland district but attended day program in District of Columbia, that Maryland district "cannot refuse to conduct the evaluation and determine the child's eligibility for FAPE because the child attends a private school in another [district]" if the parent requested such an evaluation).[26]

Another angle on the question is that the IDEA requires each state to provide a FAPE to all children with disabilities "residing in the State." 20 U.S.C. § 1412(a)(1)(A). The District suggests that under New York State law, J.G. was no longer a "resident" of New York when she was placed in True North and later MA, so it was absolved of responsibility to provide her a FAPE under the statute. (Dist. Opp'n 5–6.) *See J.S. v. Shoreline Sch. Dist.*, 220 F.Supp.2d 1175, 1191–93 (W.D.Wash.2002) (holding that district's obligation to revise IEP and conduct evaluations of student who had moved out of district ended because, under Washington state law, student no longer was resident of district). The District is probably on the right track in focusing on state law, as the IDEA child find provisions on which the District relies are contained in a section that only deals with a state's "eligibility" for federal funds, and the IDEA does not provide for any particular way in which a state must comply with those provisions. *See* 20 U.S.C. § 1412(a); *Ms. K.*, 2006 WL 3081555, at *14 ("Such a statutory provision cannot fairly be read to dictate any specific policies and procedures such as which [local education agency] must carry out those tasks necessary for a state to meet the eligibility requirements for [IDEA] funding.").

---

**26.** The Department of Education letter relied on by the District is inapposite because it involves a parent's request that a district in which a private school was located provide supplemental instructional services. *See* Letter from Patricia J. Guard, Acting Dir., Office of Special Educ. Programs, U.S. Dep't of Educ., to Sen. Joseph I. Lieberman, at 1 (Jan. 25, 2008).

The District points to N.Y. Education Law § 3602–c(2)(a), which requires a request for "education for students with disabilities" attending non-public schools to be filed "with the ... school district of location...." Again, however, this section does not imply that parents may not *also* seek a FAPE for a privately placed child from the district of the parents' residence.

"[R]esidence" for the purposes of New York Education Law § 3202 "is established by one's physical presence as an inhabitant within the district, combined with an intent to remain." *Longwood Cent. Sch. Dist. v. Springs Union Free Sch. Dist.*, 1 N.Y.3d 385, 774 N.Y.S.2d 857, 806 N.E.2d 970, 972 (2004). "The general rule is that a school district must provide free education to children whose parents or legal guardians reside within the district." *Catlin ex rel. Catlin v. Sobol*, 77 N.Y.2d 552, 569 N.Y.S.2d 353, 571 N.E.2d 661, 662 (1991). Presumably, when a parent wishes to move a privately placed child into the public schools where that parent resides, under New York law the district is obligated to take that student. *See Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir.1996) (noting that the New York Court of Appeals has held that under § 3202, there is a "presumption that children reside with their parents," and that " 'this presumption may be overcome by showing that the parents or guardians have given up parental control and that the child's permanent domicile—i.e., the child's actual and only residence—is' " elsewhere (quoting *Catlin*, 569 N.Y.S.2d 353, 571 N.E.2d at 665)); *cf. Bd. of Educ. v. Greek Archdiocese Inst. of St. Basil*, 75 A.D.3d 569, 905 N.Y.S.2d 271, 274 (2010) (holding that public school district in which private school was located was not obligated to pay costs of tuition at private school for students who were not residents of public school district). Thus, even following the District down the state law road, it appears that New York parents who intend to return privately placed children to their district of residence may seek a FAPE from that district even though their children are in out-of-district non-public schools.

Moreover, the District's argument is incompatible with the Second Circuit's decision in *Frank G. v. Board of Education of Hyde Park*, which the Supreme Court in *Forest Grove* endorsed, *see Forest Grove*, 129 S.Ct. at 2490 n. 3.[27] There, the Second Circuit affirmed a tuition reimbursement award made to adoptive parents of a child who had never attended the defendant district's schools, and to whom the district had provided a concededly inadequate IEP. The child had spent his entire school career in private schools outside the district. *Frank G.*, 459 F.3d at 359–61. As the Supreme Court would later do in *Forest Grove*, *Frank G.* rejected the argument that a tuition award was categorically barred because the child had never before received special education services from the district. *See id.* at 367–68. Thus, the parents in *Frank G.* received reimbursement even though their child had *never* attended the defendant's public schools and had *always* attended out-of-district private schools. This result cannot be reconciled with the District's argument, which would have required the parents in *Frank G.* to have sought special education services from the local districts encompassing

---

27. In fact, the District's reading of the law is in considerable tension with the Supreme Court's holding in *Forest Grove*—that the IDEA authorizes tuition reimbursement "regardless of whether the child previously received special education or related services through the public school," *Forest Grove*, 129 S.Ct. at 2496. The District's argument would effectively reverse this holding with respect to children who are in out-of-district placements but seek a FAPE in their district of residence.

Moreover, the District's reading would create a peculiar system: home districts would not have an obligation to provide any IDEA-required services if parents who withdrew their disabled child from the public schools changed their minds and sought to bring their child back home, until the child was physically removed from the private school and returned to the district's geographic boundaries.

the child's various private schools.[28]

Thus, in this case the Parents were entitled, under both federal and state law, to place J.G. in a private school even though the District had not previously denied J.G. a FAPE, and also to seek a FAPE from the District, presumably as part of a plan to bring J.G. home to a public placement. The Court recognizes that it is disputed that this was the Parents' actual intent in this case, but that question goes more to the equities of a reimbursement, rather than to the District's legal obligations. *Cf. Frank G.*, 459 F.3d at 376. The Court concludes that the IDEA's child find provisions did not divest the District of its responsibility to classify J.G. and provide her with services after she was unilaterally withdrawn from the District in January 2008.

### 2. The District's Placement

■ Neither Party appealed the IHO's finding that the 6/25/08 IEP proposed services that were adequate to meet J.G.'s needs. (SRO Decision 13.) Similarly, before this Court, neither Party argues that there was anything substantively wrong with the IEP. Thus, the only question is whether the IHO and SRO correctly found that the District had not demonstrated the appropriateness of the Summit School as its recommended placement.

■ The Second Circuit has held that an IEP's failure to specify a particular location at which its program would be implemented is not a per se *procedural* violation of the IDEA. *See T.Y.*, 584 F.3d at 420. Likewise, even though under the statute an IEP must include a statement about, among other things, "the anticipated frequency, *location,* and duration" of its recommended services, 20 U.S.C.

§ 1414(d)(1)(A)(i)(VII) (emphasis added), an IEP does not have to specify "a specific school site," *T.Y.*, 584 F.3d at 419. Nevertheless, a school district's recommended program must still be tested to determine whether it is "reasonably calculated to enable the child to receive educational benefits." *T.P.*, 554 F.3d at 252 (internal quotation marks omitted). When an IEP's services are to be implemented at an outside placement, the recommended placement must not be wholly incapable of providing the services the IEP requires. *See T.Y.*, 584 F.3d at 420 ("We emphasize that we are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements."); *O.O. ex rel. Pabo v. District of Columbia,* 573 F.Supp.2d 41, 53 (D.D.C. 2008) ("[The district] must also implement the IEP, which includes offering placement in a school that can fulfill the requirements set forth in the IEP." (citing 20 U.S.C. § 1401(9))); *Mr. X. v. N.Y. State Educ. Dep't,* 975 F.Supp. 546, 559–61 (S.D.N.Y.1997) (district's program inadequate where record did not show that recommended placement could provide the services the IEP required).

The Second Circuit has held that "[t]he party who commences an impartial hearing . . . bears the burden of persuasion on both *Burlington* factors," i.e., whether the IEP was appropriate and whether the parents' unilateral placement was appropriate. *Gagliardo,* 489 F.3d at 112. *Gagliardo* cited *Schaffer v. Weast,* 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), which held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer,* 546 U.S. at 62, 126 S.Ct. 528. *Schaffer* expressly declined to decide

---

28. *Frank G.* did make clear that the equities could still bar a tuition award depending on the parents' conduct, but that the parents

there had not behaved in a manner that made tuition reimbursement inequitable. *See Frank G.,* 459 F.3d at 376.

whether states "may, if they wish, override the default rule and put the burden always on the school district." *Id.* at 61, 126 S.Ct. 528. New York has done so, placing the burden "of persuasion and ... of production" on local education agencies, "except that a parent ... seeking tuition reimbursement for a unilateral parental placement" bears the burden of proof "on the appropriateness of such placement." N.Y. EDUC. LAW § 4404(1)(c) (McKinney 2007); *see also W.T. & K.T. ex rel. J.T. v. Bd. of Educ.*, 716 F.Supp.2d 270, 287 (S.D.N.Y. 2010) (noting that § 4404(1)(c) is an "attempt[ ] to shift [the] burden" described in *Schaffer*).

In this case, the Court cannot disagree with the assessments of the IHO and SRO that there is simply not enough in the record to determine whether Summit could implement J.G.'s IEP, or whether placing J.G. there was reasonably calculated to enable her to achieve educational benefits. (IHO Decision 17; SRO Decision 14.) Much of the description of Summit's program contained in the record is found in A.G.'s testimony or the Parents' evidence, not the District's. All the District produced was an e-mail from a Summit representative, Deborah Sherwood, stating that J.G. "could be an appropriate candidate for our residential program" (DX 27), and Mendelson's testimony that he thought Summit would have been an appropriate program for J.G. (Tr. 150–51). Mendelson's testimony was quite general, however, and he did not discuss the amount of therapy Summit provided or its class sizes, both aspects of J.G.'s education for which her IEP had specific requirements. Sherwood's e-mail is somewhat more probative, as Summit had received J.G.'s IEP and presumably Sherwood was familiar with it when she said the school might be a good

fit for J.G. However, Rodstein, a witness for the District who knew J.G. far better than did Mendelson, testified that he did *not* think Summit would have been appropriate for J.G., given his own experience of the school and his knowledge of J.G. (Tr. 22 (Mendelson) (noting that he did not know J.G.); *id.* at 375–79 (Rodstein).) The District did not produce a Summit witness to testify at the hearing, nor did it introduce exhibits explaining Summit's offerings. And, despite the conclusions of both administrative review officers that the District had not made a full enough record on the adequacy of Summit, the District has not availed itself of the opportunity to produce new evidence to this Court. *See Grim*, 346 F.3d at 380 (noting that district courts may consider "any further evidence presented ... by the parties" in reviewing IDEA administrative decisions (citing 20 U.S.C. § 1415(i)(2)(B))).

The District essentially blames the Parents for its own failure to show that Summit would be appropriate for J.G., because the Parents did not take J.G. for an intake interview. (Dist. Mem. 17; Dist. Opp'n 13–14.) The Parents' behavior, however, factors into the equitable calculus. Nothing the Parents did prevented the District from producing more evidence that Summit could have provided J.G. with the services her IEP required, which was all the District was required to do.

Therefore, the Court agrees with the IHO and SRO that the District failed to provide a FAPE to J.G., but only in the sense that the record does not demonstrate Summit's appropriateness.[29] But, the Court also does not agree that the problems the Parents identified in their July 28, 2008 letter to the District regarding Summit show that the school was inappropriate. The Parents complained that

---

**29.** There is nothing at all in the record about Harmony Heights, the District's backup

placement that contacted A.G. in summer 2008 regarding J.G. (Tr. 809–10 (A.G.).)

J.G. would not be able to handle the full course load that Summit would require and that the school provided inadequate therapy. (PX A.) But to be an appropriate placement, Summit only had to provide "sufficient support services to permit the child to benefit educationally from [its] instruction," and did not have to be the "best educational opportunit[y] available" or "maximize [J.G.'s] potential." *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F.Supp.2d 606, 639 (S.D.N.Y. 2011) (internal quotation marks omitted). J.G.'s IEP only called for three weekly counseling sessions (6/25/08 IEP, at 1–2), and though it stated that J.G. would "not participate in general education core academic programs," it did not say that J.G. needed a reduced courseload, nor did it specify how many classes J.G. should have per school day, (*id.*). The record does not reflect whether the Parents ever questioned the adequacy of these provisions of the IEP, and they certainly did not challenge them in the administrative proceedings.

### 3. The Parents' Unilateral Placement

 As with the District's recommended placement, the appropriateness of the Parents' chosen private placement "turns on whether [the] placement ... is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034). The Court must look to whether the private placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *Gagliardo*,

489 F.3d at 115 (emphasis in original) (internal quotation marks omitted); *see also E.S. ex rel. B.S. v. Katonah–Lewisboro Sch. Dist.*, 742 F.Supp.2d 417, 444 (S.D.N.Y.2010) (same). While they are not dispositive factors, "[g]rades, test scores, and regular advancement ... constitute evidence that a child is receiving educational benefit." *Frank G.*, 459 F.3d at 364.

The District's challenge to the IHO's and SRO's conclusions that MA was an appropriate placement for J.G. is without merit, as substantial evidence supports the administrative officers' findings. As the SRO's decision shows, McKinnon and Santa gave thorough descriptions of the academic and clinical programs the school offered, and their testimony establishes beyond a preponderance that J.G. did in fact receive educational benefits from the school. Her grades went up, her difficulty completing assignments slowly diminished, and apparently her emotional ailments also improved, as she was able to stop taking psychiatric medications altogether. (Tr. 496–507 (McKinnon); 568–69 (Santa); PX B.) At the time of the hearing, J.G. was expected to graduate on schedule and begin college in fall 2009. (Tr. 531–32.) Compare this with Dr. Leventhal's assessment in January 2008, when she felt that J.G. was likely, without a serious intervention, to drop out of school entirely or fail when she got to college. (Tr. 754 (A.G.).) Therefore, the Parents have carried their burden to show that MA was appropriate for J.G.'s needs.[30]

---

**30.** The District's only response that merits mentioning is its argument that J.G. was not a good fit for MA because many of its students had had exposure to drugs or alcohol, and because MA grouped its students only by gender, not according to their needs. (Dist. Mem. 19–20; Dist. Opp'n 14–15.) These points simply ignore the hearing testimony, which established that 1) J.G.'s problems were "fairly familiar" and "not ... uncommon" in other MA students (Tr. 485–86, 523); 2) part of the point of MA's clinical program was mixing students by age and diagnosis (*id.* at 513); and 3) MA's services were not primarily aimed at combating substance abuse, (*id.* at 514).

### 4. Equitable Considerations

██ The IDEA provides that this Court "*may* require the [local education] agency to reimburse the parents for the cost of [private] enrollment" upon a finding that "the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). Under the statute, this reimbursement may be "reduced or denied" under certain circumstances: as relevant here, these are first, if "10 business days" before removal of their child, "the parents did not give written notice to the public agency" that they were "rejecting the placement proposed by the public agency ..., stating their concerns and their intent to enroll their child in a private school at public expense," *id.* § 1412(a)(10)(C)(iii)(I)(aa)-(bb); and second, "upon a judicial finding of unreasonableness with respect to the actions taken by the parents," *id.* § 1412(a)(10)(C)(iii)(III).[31] The Supreme Court has suggested that the statutory factors are a non-exhaustive list. *See Forest Grove,* 129 S.Ct. at 2493 ("The clauses of § 1412(a)(10)(C) are ... best read as elucidative rather than exhaustive."). In addition, as mentioned earlier, this Court has broad discretion to consider the range of all relevant facts in determining whether and to what extent awarding relief is equitable. *See Carter,* 510 U.S. at 16, 114 S.Ct. 361; *Gagliardo,* 489 F.3d at 112. Among the most important of these is "whether the parents have cooperated with the [District] throughout the process to ensure their child receive a FAPE." *Bettinger v. N.Y.C. Bd. of Educ.,* No. 06–CV–6889, 2007 WL 4208560, at *6 (S.D.N.Y. Nov. 20, 2007).

The Parents did not provide the District with any notice whatsoever before withdrawing J.G. from Scarsdale High School in January 2008, and they did not provide any notice before August 18, 2008, that they were rejecting the District's proposed placement and enrolling J.G. at MA at public expense. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I).[32] The Parents partly respond by arguing that prior to June 25, 2008, when the District recommended Summit, there was no recommended program to reject. (Parents' Mem. 11–12.) This is a fair point, but both sides contributed to the amount of time it took for the District to come up with the Summit recommendation. Between January 25, 2008, when the Parents first requested an evaluation for J.G. (DX 1), and the April 17, 2008 CSE meeting, the District appears to have diligently attempted to gather the information it needed to complete that evaluation. The District may have been slowed down by its failed attempts to meet with J.G., despite repeated requests to the Parents (DX 4, 6), though the District did receive Dr. Leventhal's report (on February 25, 2008), and was ultimately able to classify J.G. without a meeting.[33]

---

**31.** Reimbursement may also be reduced or denied if "prior to the parents' removal of the child from the public school," the district informed the parents of its intent to evaluate the child, "but the parents did not make the child available for such evaluation." 20 U.S.C. § 1412(a)(10)(C)(iii)(II). This factor does not apply here because the Parents took J.G. out of the District's school before the District *could* even have sought an evaluation. Whether the Parents made J.G. "available for [an] evaluation" *after* they sought review by the CSE is, however, still a relevant fact to consider in weighing the equities.

**32.** The Parents do not argue that the statutory exceptions to the notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iv) apply here.

**33.** In the Court's view, the Parties' dispute regarding whether the District ought to have sought to evaluate J.G. in Vermont or Montana, or whether the Parents had an obligation to return J.G. to Scarsdale for such an

Stepping back, though, the purpose of the notice requirement is to give the district "a meaningful opportunity to minimize its expenses by developing its own IEP that would provide the child with a FAPE within the School District." *W.M.*, 783 F.Supp.2d at 504; *see also M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 69 (2d Cir.2000) ("Because [student's] parents failed to place in issue the appropriateness of [student's] IEPs, it is impossible to determine with any certainty whether their expenditures were indeed necessary, or whether a prompt complaint might have obviated the need for those expenditures." (alterations and internal quotation marks omitted)).[34] Had the Parents given the District any sort of notice before withdrawing J.G. in January 2008, the District might well have been able to offer J.G. a placement sooner, perhaps even before she left for MA, making the considerable expense of that school unnecessary. *See R.B. v. N.Y.C. Dep't of Educ.*, 713 F.Supp.2d 235, 248 (S.D.N.Y.2010) ("[T]he IDEA's notice requirement gives the school system an opportunity, *before the child is removed*, to assemble a team,

evaluate the child, devise an appropriate plan, and determine whether a FAPE can be provided in the public schools." (emphasis added) (alterations and internal quotation marks omitted)). In addition, "[c]ourts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." *Voluntown*, 226 F.3d at 68.

On the other hand, by the time the Parents went through the IEP process, they had engaged with the District about J.G.'s placement. Such participation can satisfy the intent of the notice requirement. *Cf. Ivan P. v. Westport Bd. of Educ.*, 865 F.Supp. 74, 82 (D.Conn.1994) (noting "significant efforts at communication between the plaintiffs and the Westport Board"; "this is not a case where the parents failed to voice their dissatisfaction with a placement"), *aff'd*, 101 F.3d 686, 1996 WL 304758 (2d Cir.1996) (unpublished). And, the District did not respond to the Parents' letter on July 28, 2008,

---

evaluation, cannot be resolved completely in favor of one side or the other. Both sides took an arguably reasonable position: From the Parents' perspective, they believed that J.G. could not return home without regressing in her treatment. But, for the District, faced with Parents who sought an evaluation after they themselves had sent their child out of state, it was not unreasonable to request the Parents to make more effort to make their child truly "available." *See Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 469 (7th Cir.2000) (affirming denial of tuition reimbursement where parent placed student in out-of-state private school without prior warning to the district, and parent's sole effort to cooperate with district was to "offer[ ] to allow [the district's] staff to travel to Maine to evaluate [the student] at [the private school]"). What makes this episode less significant in the Court's view is that the District ultimately agreed that it was able to classify J.G. as disabled without conducting its own evalua-

tion, the Parents' intransigence notwithstanding.

34. The Parents argue that the District recommended Summit because it was "fixated" on getting J.G. into a program for which it could be reimbursed by the State. (Parents' Mem. 15, 18.) The only possible support for this argument that the Court could find in the record is one highly ambiguous statement in A.G.'s testimony. (Tr. 792 ("[LaSalle] said that . . . because of the financial powers that be it may not—something to the effect of it may not work out because of the financial issues, the way Scarsdale operates and stuff like that. I don't know. I don't remember the details.").) Apart from the fact that the Parents' argument appears to have no substantial support in the record at all, there is nothing illegitimate about a school district attempting to comply with its IDEA obligations while minimizing its costs.

explaining their concerns with Summit. (PX A.) *See Wood v. Kingston City Sch. Dist.*, No. 08–CV–1371, 2010 WL 3907829, at *8 (N.D.N.Y. Sept. 29, 2010) (faulting school district for failing to meaningfully respond to parents' letter raising detailed objections to proposed IEP). Therefore, the Parents' failure to provide the required notice to the District should only weigh against a tuition award for the period prior to mid-August 2008.[35]

The evidence on the issue of whether the Parents otherwise cooperated with the District is mixed. On the one hand, the Parents participated in the CSE process, they provided the CSE with the information in their possession including Dr. Leventhal's report, they provided comments on the proposed IEP, and A.G. visited the District's recommended placements (the day programs and Summit). *See Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F.Supp.2d 403, 419 (S.D.N.Y. 2011) (tuition reimbursement warranted where parents cooperated with district, "participated at … CSE meeting," "visited proposed placements," and gave district timely notice before re-enrolling student in private school). *But see Bettinger*, 2007 WL 4208560, at *7, *9 (denying tuition reimbursement even though parents "wholly cooperated" in "formulation of the IEP," but made no effort to engage with proposed placement schools). A.G. also testified that the Parents "would have brought [J.G.] home" from MA "if the committee [had] offered a school that met the needs of our daughter." (Tr. 810.)[36]

However, apart from failing to notify the District in advance before removing J.G. from the District, the Parents applied to MA in mid-February 2008, signing a form committing themselves to enroll J.G. for the full 16–18 month program. (PX C, at 30.) The Parents enrolled J.G. in True North as a prerequisite to admission to MA, so their decision had been made as early as January 2008. (Tr. 759–60 (A.G.).) *See S.W. v. N.Y.C. Dep't of Educ.*, 646 F.Supp.2d 346, 364 (S.D.N.Y.2009) (tuition reimbursement not equitable where, among other things, parent signed enrollment contract committing to reject public placement prior to visiting proposed public school); *Bettinger*, 2007 WL 4208560, at *7 (denying tuition reimbursement where parents made plans to send child to a private school of their choice months before requesting IEP from school district); *cf. N.Y.C. Dep't of Educ. v. V.S.*, No. 10–CV–5120, 2011 WL 3273922, at *15 (E.D.N.Y. July 29, 2011) (parent's signing of enrollment contract and payment of partially refundable deposit did not show lack

---

**35.** The District does not argue that the Parents' August 18, 2008 letter did not comply with the notice requirement.

**36.** There is some indication, however, that the Parents were not entirely forthcoming with the CSE during the IEP process. For instance, A.G. testified that Dr. Leventhal advised the Parents in January 2008 that it was important for J.G.'s recovery that she not remain at home (Tr. 756 ("Dr. Leventhal … the way she explained it to us, that when [J.G.] goes to therapy and comes home, it erases the therapy because she walks back to an environment where between all of the things, all of the triggers for her completely diminish the therapy. The therapy ends as she walks in the house.").) Additionally, though the Parents would later argue that Summit did not provide enough therapy, they did not, so far as the record shows, object to the revised 6/25/08 IEP, which only required therapy three times weekly in thirty-minute sessions. Similarly, Dr. Leventhal would later testify that she advised the Parents to consider "a range of possible placements," including residential *and* non-residential locations. (*Id.* at 664 (Leventhal).) Finally, it bears repeating that the Parents did not appeal the IHO's finding that the program recommended by the IEP, including a residential program, small class sizes, and therapy, was appropriate for J.G. (SRO at 13–14.)

of cooperation, as the IEP was not developed until close to the beginning of school year and parent enrolled child in private school to preserve his educational options, and parent was otherwise cooperative); *Wood*, 2010 WL 3907829, at *9 (enrollment contract with private school did not commit student to returning and parent signed it to save his place before receiving proposed IEP).

Moreover, the Parents' decision not to bring J.G. to interview at Summit, even though they were told multiple times that an interview was necessary before the placement process could continue, arguably "obstructed the [District's] placement process." *N.R. ex rel. T.R. v. Dep't of Educ.*, No. 07–CV–9648, 2009 WL 874061, at *7 (S.D.N.Y. Mar. 31, 2009). There is some evidence in the record suggesting the Parents knew they would not be able to bring J.G. home for interviews for at least several months after her enrollment at MA. (Tr. 530–31 (McKinnon's testimony that MA students are not allowed visits home in the regular course until they have progressed through the program).) To be sure, to the extent the Parents' decision to forego interviews frustrated the District's attempts to place J.G., it cannot be said that the Parents' actions were wholly inappropriate, given their perception of Dr. Leventhal's advice to them that J.G. had to be taken out of Scarsdale for her treatment to be effective. (*Id.* at 756 (A.G.).) *Cf.* 20 U.S.C. § 1412(a)(10)(C)(iii)(III). But, at the same time, they also call into question the Parents' commitment to engage with the District in finding an acceptable placement of the District's choosing.[37]

Finally, the record raises significant questions regarding whether the Parents' apparent cooperation with the District was genuine. At the April 17, 2008 CSE meeting, when Dr. Mendelson asked the Parents when J.G. would return to the District, to determine when her services would need to commence, the Parents responded that "she could return at anytime but at that time they only wanted her classified"; i.e., they did not seek an actual placement. (4/17/08 IEP, at 5.) Dr. Mendelson told the Parents that the District had to recommend a placement if J.G. was classified. (*Id.*) The Parents, when told that interviews would be required at any school the District recommended, responded that they "want[ed] to see what the District can offer." (Tr. 111 (Mendelson).) When, at the June 25, 2008 meeting, the CSE changed J.G.'s recommended placement to a residential program, "[the Parents] offered no agreement or disagreement with regard to any recommendation the CSE made, at least verbally. They essentially wanted to see what the CSE would come up with as far as a placement, but [Mendelson did not] recall them saying yes, we agree with a residential placement or we don't agree with a residential placement." (*Id.* at 135.)

Courts in this area have distinguished between "a unilateral parental transfer made after consultation with the school system" and "transfer made truly unilaterally, bereft of any attempt to achieve a negotiated compromise and agreement." *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 799 (1st Cir.1984),

---

**37.** The District's failure to provide a FAPE for J.G.—if Summit was in fact inadequate to serve J.G.'s needs, which has never been definitively determined—was not so egregious in this case that it might justify or outweigh the Parents' failure to cooperate. *Cf. N.R.*, 2009 WL 874061, at *7 ("[T]he Department's 'abdi-cation of its responsibility to provide FAPE is so clear from the record—and the law's imposition of this duty on the Department is so well-settled—that the equities favor the parents.'" (alterations omitted) (quoting *Gabel v. Bd. of Educ.*, 368 F.Supp.2d 313, 329 (S.D.N.Y.2005))).

*aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A court is justified in denying tuition reimbursement where there is no indication the parents ever intended to return their child to a placement offered by the school district. *See Carmel Cent. Sch. Dist. v. V.P.,* 373 F.Supp.2d 402, 416 (S.D.N.Y.2005) (denying tuition reimbursement where parents "never had the slightest intention of allowing the child to be educated in the public school, and did everything possible so that they could frustrate a timely review of [the child's] condition before they re-enrolled her in [private school]"); *cf. Wood,* 2010 WL 3907829, at *9 ("[T]here is no indication that plaintiffs never intended to return [student] to the District."); *R.B.,* 713 F.Supp.2d at 248 ("[T]here is nothing in the record to suggest that Plaintiffs would not have considered, in good faith, a public school placement had one been made."). The Parents in this case were not as uncooperative as in some of the examples cited above, in that A.G. did visit Summit. *See Bettinger,* 2007 WL 4208560, at *7–*8 (parent "simply did not engage" with district's proposed placements and never visited even on her own); *Carmel,* 373 F.Supp.2d at 418 (parents hid child's disability and "refused to observe or consider" alternatives to unilateral placement).[38]

But, there is other evidence that the Parents, once they enrolled J.G. in True North in January 2008 and signed the MA application in February, were (at best) strongly disinclined to return J.G. to Scarsdale and accept a placement offered by the District. The Parents did not engage with the District's attempt to "place the child in an appropriate private setting of the State's choice," which is all the

District was obligated to do under these circumstances. *Carter,* 510 U.S. at 15, 114 S.Ct. 361. And, while the District may not have responded to all of the Parents' professed concerns about Summit (without raising a whisper of a complaint about the IEP itself), it hardly can be said that the Parents were diligent in following up with the District. And, from the District's perspective, there was little point in continued communication with the Parents about Summit, for it would have seemed reasonably clear to the District that the Parents would not make J.G. available to Summit officials, and her admission was thus impossible. (*See* DX 29, at 2 (Letter from Dr. Mendelson to the Parents (Oct. 30, 2008)) (noting that while the CSE could discuss "alternative ways of providing services" to J.G., "the schools need an opportunity to meet with the student in addition to reviewing clinical material so that this discussion can go forward").)

In the end, even though the Parents unilaterally removed J.G. from the District before requesting services, this is not a case where the Parents completely refused to cooperate with the District in finding an appropriate placement for their child. Thus, the Court finds that the Parents should not be denied reimbursement entirely. *Cf. Bettinger,* 2007 WL 4208560, at *9 (denying, on equitable grounds, any tuition reimbursement where parent refused to visit proposed placement after unilaterally enrolling the student in a private school). But, this is also far from a case where the Parents sought to fully cooperate with the District. Rather, the Parents committed J.G. to an eighteen-month program in a private school far away from the District, and *then* requested that the Dis-

---

**38.** This case is like *Bettinger* in significant respects, however, because there, as here, the parents enrolled the child in a private school and paid deposits for the summer and follow-ing academic year before they even requested an IEP from the local school district. 2007 WL 4208560, at *1–2.

trict convene the CSE. And, while the Parents visited the proposed placement and relayed certain concerns to the District about it (without objecting to the IEP), they refused to make J.G. available to the school, thus making any placement virtually impossible. It may be that the Parents had not foreclosed any possibility of the student's return to New York, *cf. S.W.*, 646 F.Supp.2d at 353–54, 364 (enrollment contract at private placement committed parent in advance to reject public school placement), but the available evidence strongly supports the conclusion that the Parents were very unlikely to do so unless they felt the District made a better offer than MA, something the IDEA does not require. *See T.Y.*, 584 F.3d at 420 ("The parents' actions suggest they seek a 'veto' over school choice, rather than 'input'—a power the IDEA clearly does not grant them."); *Walczak*, 142 F.3d at 130 ("The Supreme Court … has specifically rejected the contention that the 'appropriate education' mandated by IDEA requires states to 'maximize the potential of handicapped children.'" (quoting *Rowley*, 458 U.S. at 197 n. 21, 102 S.Ct. 3034)); *see also Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C.Cir.1984) (noting that the IDEA's predecessor statute "does not secure the *best* education money can buy; it calls upon the government, more modestly, to provide an *appropriate* education for each child" (emphasis in original)).

Thus, in the exercise of its discretion, and taking into consideration the record as well as the findings of the IHO and SRO, the Court concludes that equitable considerations justify reducing the Parents' tuition reimbursement request by 75%. This reduction reflects the Parents' unilateral placement of J.G. at MA, their delayed notice to the District of their insistence that the District pay tuition at MA, the at best mixed evidence of the Parents' cooperativeness with the District, and the Parents' apparent predisposition to view skeptically any placement other than MA that the District might suggest.

### III. Conclusion

For the forgoing reasons, the Parents' motion for summary judgment is granted to the extent the Parents are awarded 25% of the reimbursement they seek from Defendants, and the District's motion for summary judgment is denied. The Clerk of the Court is respectfully requested to terminate the pending motions (Dkt. Nos. 11, 14).

The Plaintiffs are to provide the Court, by letter, with a proposed judgment reflecting the amount of reimbursement to which they are entitled in light of the Court's decision, along with an affidavit substantiating the reimbursement amounts, within 14 days of this opinion. The Defendant may respond within 14 days if it wishes to challenge the Plaintiffs' calculations.

SO ORDERED.